UNITED STATES of America,
Appellee,

v.

Dominic ALLOCCO, Petitioner-Appellant.

No. 360, Docket 27495.

United States Court of Appeals
Second Circuit.

Argued May 7, 1962.

Decided July 10, 1962.

Paul Bender, Philadelphia, Pa. (The Legal Aid Society, Anthony F. Marra, New York City, on the brief), for petitioner-appellant.

Andrew T. McEvoy, Jr., Asst. U. S. Atty., So. Dist. N. Y. (Robert M. Morgenthau, U. S. Atty., So. Dist. N. Y., and Arthur I. Rosett, Asst. U. S. Atty., So. Dist. N. Y., on the brief), for appellee.

Before CLARK, KAUFMAN and HAYS, Circuit Judges.

KAUFMAN, Circuit Judge.

Dominic Allocco was tried before Judge John M. Cashin and a jury in the United States District Court for the Southern District of New York. On October 20, 1955, the jury found Allocco guilty on three counts of an indictment charging him with violation of the narcotics laws, 21 U.S.C.A. §§ 173, 174, and 18 U.S.C. § 371; and on October 31, Allocco was sentenced by Judge Cashin to 10 years imprisonment. The conviction was appealed. A panel of this Court found that the evidence of Allocco's guilt was "overwhelming" and that the jury's verdict was "thoroughly justified." Hence, the conviction was affirmed. U. S. v. Allocco, 234 F.2d 955, 956 (2d Cir. 1956) (per curiam), cert. denied, 352 U.S. 931, 77 S.Ct. 231, 1 L.Ed.2d 165 (1957).

Allocco began to serve his sentence, but he continued to challenge his conviction. A description of his efforts is set forth in the opinion of the court below in the instant proceedings, but the earlier applications are not relevant to the issues presently before this Court. The current appeal stems from an order entered by Judge Richard H. Levet in the United States District Court for the Southern District of New York, which denied Allocco's motion under 28 U.S.C. § 2255 to set aside the 1955 conviction because of asserted defects not considered before. U. S. v. Allocco, 200 F.Supp. 868 (S.D.N.Y.1961).[1]

The facts upon which the petitioner based his claim for relief in the court below are not in dispute. On July 31, 1955, the retirement of Judge Samuel H. Kaufman as United States District Judge for the Southern District of New York became effective. At that time the United States Senate was in regular session. However, the vacancy created by Judge Kaufman's retirement was not filled immediately, and it remained open when the Senate adjourned, *sine die*, at midnight on August 2, 1955.[2]

On August 17, 1955, Dwight D. Eisenhower, as President of the United States, issued a recess commission to John M. Cashin, appointing him United States District Judge for the Southern District of New York. By this act, President Eisenhower filled the vacancy caused by the retirement of Judge Kaufman during the previous July. The oath of office was administered on September 15, 1955; and Judge Cashin, by virtue of his recess appointment, assumed office.

About one month later, petitioner was tried before Judge Cashin and a jury for the narcotics offenses described above. As we have already noted, the jury returned a verdict of guilty on three counts of the indictment, and Judge Cashin pronounced sentence. It is this sentence, and the conviction upon which it rests, that petitioner now challenges.

Although it is not directly relevant to the issues here considered, it should be pointed out that after the Senate reconvened in January, 1956,[3] Judge Cashin was duly nominated by the President, confirmed by the Senate,[4] and commissioned as a judge of the United States with life tenure.[5] On March 9, 1956, the oath of office was administered as prescribed by 28 U.S.C. § 453.

Petitioner contends that his conviction and sentence must be set aside because Judge Cashin was not constitutionally empowered to preside over the trial. His attack on the conviction does not question the ability or character of

---

1. The motion was brought pursuant to Section 2255 "and/or Rule 35" of the Federal Rules of Criminal Procedure, 18 U.S.C. However, on appeal the parties treat the application as one made exclusively under Section 2255.

2. S.Con.Res. 57, 101 Cong.Rec., part 12, D612.

3. January 3, 1956, 102 Cong.Rec., part 1, p. 3.

4. March 1, 1956, 102 Cong.Rec., part. 3, p. 3644.

5. March 2, 1956.

Judge Cashin, or the manner in which he presided over the trial. Rather, it is concerned with general constitutional questions concerning Presidential power to make interim judicial appointments and the authority of judges so appointed. Petitioner argues that (a) the President has no power to appoint "temporary" judges; (b) if the President can make interim appointments, the "temporary" judges may not preside over criminal trials; and that in any event, (c) the President has no power to fill vacancies in the judiciary which arise when the Senate is in session. We have considered these contentions carefully; and have scrutinized the detailed arguments made by able assigned counsel on petitioner's behalf since the issues presented have not been examined previously by a judicial tribunal *in extenso*. However, we believe that petitioner's arguments cannot prevail, and are persuaded that Judge Cashin was constitutionally empowered to preside over petitioner's trial.

## I.

The Government urges us at the outset not to consider the merits of petitioner's constitutional arguments because they are barred by the so-called *de facto* doctrine. Relying on the early case of Ex parte Ward, 173 U.S. 452, 19 S.Ct. 459, 43 L.Ed. 765 (1899), the Government maintains that petitioner cannot challenge his conviction in collateral proceedings by asserting (for the first time) that Judge Cashin's commission was involved.

> " * * * [W]here a court has jurisdiction of an offence, and of the accused, and the proceedings are otherwise regular, a conviction is lawful although the judge holding the court may be only an officer *de facto;* and * * * the validity of the title of such judge to the office, or his right to exercise the judicial functions, cannot be determined on

a writ of *habeas corpus.*" Id., at 454, 19 S.Ct. at 460.

Moreover, the Government argues that even in 1955 petitioner could not have objected to a trial before Judge Cashin on the constitutional grounds asserted here, either in the District Court or in this Court on direct appeal from the conviction.

After we heard argument in this appeal, however, the Supreme Court had occasion to re-examine the *de facto* doctrine. The issue was raised in two cases (considered together) involving the power of so-called Article I judges to participate in (or render) decisions of a court created under Article III of the Constitution. In one case, Glidden Co. v. Zdanok, 82 S.Ct. 1459 (1962) the question was whether Judge J. Warren Madden, then an active judge of the Court of Claims sitting by designation in this Court, could join in our decision of an appeal. In the other case, Lurk v. U. S., decided sub nom. Glidden Co. v. Zdanok, supra, the question was whether Judge Joseph R. Jackson, a retired judge of the Court of Customs and Patent Appeals sitting by designation in the United States District Court for the District of Columbia, could preside over a criminal trial. Although the constitutional issue had not been raised in either case for determination by the judges involved,[6] the Supreme Court permitted private litigants to attack both judgments on the ground that they were deprived of constitutional rights because the judges were not empowered to exercise judicial authority under Article III. The Supreme Court held that the defect, if established, was "jurisdictional," and it could be raised for the first time on appeal despite the *de facto* doctrine. Lack of judicial authority, Justice Harlan said, "relates to basic constitutional protections designed in part for the benefit of litigants." Id., 82 S.Ct. at 1465.

---

6. In Lurk v. U. S., supra, the issue was presented for the first time on appeal to the United States Circuit Court for the

District of Columbia, but the appeal was decided on other grounds.

■■ It is clear from the Supreme Court's decision in Lurk that an assertion of the *de facto* doctrine by the Government could not prevent petitioner from raising his constitutional claims if he were pursuing a direct appeal from his conviction at this time. Moreover, having made a non-frivolous challenge to Judge Cashin's authority to exercise judicial power under Article III, it is equally clear from Lurk that petitioner would not be penalized for his failure to make the objection in the District Court.

It is true that in Lurk the Supreme Court was not concerned with the question whether the *de facto* doctrine would bar relief if the same or similar constitutional issues were raised for the first time in a collateral attack upon a conviction; but, we believe that the Supreme Court would not have refused to consider the claim if it had been asserted in connection with proceedings brought under 28 U.S.C. § 2255. The disruption of "sound appellate process" which might result would still be "plainly insufficient to overcome the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers" called into play by the appeal. The opinion by Justice Harlan, which expressed the view of the court on the *de facto* issue, appears to have deliberately omitted any mention of Ex parte Ward, supra, although other cases bearing on the *de facto* doctrine decided before and after Ward were discussed.[7]

■ The present case, which also involves non-frivolous constitutional claims alleging the same type of defect considered in both Glidden and Lurk (and deals with the question of separation of powers between the Executive and Legislative branches of our Government), raises such important constitutional issues that we believe the petitioner should not be foreclosed from asserting them in this collateral proceeding.[8]

The *de facto* doctrine did not prevent a litigant from securing a decision by the Supreme Court in U. S. v. American-Foreign S.S. Corp., 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960). There an *in banc* judgment of this Court was set aside because a judge lacked statutory authority to participate in our decision. Nor did it prevent the Government from attacking in collateral proceedings an order issued by a district court judge exercising *de facto* authority, although he had in fact no statutory power to sit in the case involved. Frad v. Kelly, 302 U.S. 312, 58 S.Ct. 188, 82 L.Ed. 282 (1937). It may be argued that Frad is not in point, because in that case the Government, which acts "on behalf of the public," challenged the judge's authority, whereas a private litigant "ordinarily" may not upset a judgment for the same reason. See Glidden Co. v. Zdanok, supra. However that may be, the rule is not without exception. In this case the petitioner is not asking this Court to overturn his conviction "upon a technicality," which is the problem that the *de facto* doctrine is designed to alleviate. Id. Petitioner raises issues of equal importance and similar to those considered in Glidden Co. v. Zdanok, supra, and his arguments should not be dismissed because of the *de facto* rule.

Section 2255, under which the present motion was brought, states, in part:

"  *  *  * If the court finds that *the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a*

---

7. But see the concurring opinion of Justice Clark, Glidden Co. v. Zdanok, supra, at 82 S.Ct. at 1493, n. 5.

8. We still believe it to be sound doctrine that even constitutional questions should be raised on the direct appeal or be considered waived. See U. S. v. Rosenberg, 200 F.2d 666, 668 (2d Cir. 1952), cert. denied, 345 U.S. 965, 73 S.Ct. 949, 97 L. Ed. 1384 (1953). It is because of the importance of the questions raised to the Executive and Judicial branches of our Government, that we permit a departure from this tenet.

*denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack,* the court shall vacate and set the judgment aside and shall discharge the prisoner or re-sentence him or grant a new trial or correct the sentence as may appear appropriate." (Italics added.)

If Judge Cashin did not have constitutional authority to preside over petitioner's trial, petitioner's conviction and sentence would be unconstitutional and because of the unusual circumstances present here, subject to collateral attack. See Hill v. U. S., 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); Frad v. Kelly, supra.

## II.

Turning to the merits of the appeal, petitioner initially contends that the President has no power to appoint so-called "temporary" judges, i. e., judges who may take office although they do not have life tenure. In a closely related argument, petitioner also contends that even if the President has power to make interim judicial appointments, judges serving under recess commissions may not preside over criminal trials.

Article II, Section 2 of the Constitution, provides that the President,

"* * * shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, *Judges of the supreme Court, and all other Officers of the United States,* whose Appointments are not herein otherwise provided for, and which shall be established by Law: * * *.

"The President shall have Power to fill up *all Vacancies that may happen during the Recess of the Senate,* by granting Commissions which shall expire at the End of their next Session." (Italics added.)

Article III, Section 1 of the Constitution establishes the federal judiciary, and provides for life tenure ("good Behaviour"):

"The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. *The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour,* and shall, at stated Times, receive for their Services, a Compensation, *which shall not be diminished* during their Continuance in Office." (Italics added.)

It is conceded, of course, that a United States District Judge is a judge of an "inferior" court within the meaning of the term employed in Article III; and that such judges must be appointed by and with the advice and consent of the Senate as provided by Article II, Section 2.

The recess power given to the President in Article II, Section 2, is expressly made applicable to "all" vacancies; and the "vacancies" are clearly vacancies in the offices described in the preceding sentence, which could otherwise be filled only with the advice and consent of the Senate. In Alexander Hamilton's Federalist No. 67 it was pointed out that the recess power provision "is to be considered as supplementary to the one which precedes," and "the vacancies of which it speaks must be construed to relate to the 'offices' described in the preceding" clause. Petitioner does not contest this. Rather, he urges this Court to find an implied exception in the language of Article II to exclude vacancies in judicial offices. In other words, he asks us to hold that the President may not appoint judges except by nomination, and by and with the advice and consent of the Senate.

■■ The only reason given for this extraordinary proposition is that Article III, which in effect provides for life tenure for federal judges who have been appointed to exercise the judicial power created therein, does not permit an "ex-

ception" for judges appointed under the recess power of Article II. This argument appears to have been rejected by Hamilton in the Federalist No. 78.[9] It seems not to have occurred to Congress in 1795 when Chief Justice Rutledge was appointed by President Washington under the recess power, although the Senate later refused to confirm his nomination. 1 Warren, The Supreme Court in United States History, 129–139 (rev. ed. 1935); Reporter's Note, Ex parte Ward, 173 U.S. 452, 19 S.Ct. 459, 43 L.Ed. 765 (1899). Nor has petitioner directed our attention to any instance subsequent to 1795 when the President's power to appoint judges in this manner was challenged. The practice has become so common that recently the Chairman of the House Committee on the Judiciary estimated that approximately 50 federal judges were sitting under recess appointments. H.Comm.Jud., Recess Appointment of Federal Judges (1959). And when the Senate, expressing its special interest in the appointment of Supreme Court Justices, recommended that recess appointments to the highest tribunal be made sparingly, see S.Res. 334, 86th Cong., 2d Sess. (1960), it did not challenge the President's *power* to make such appointments. As Senator Hart, the sponsor of the Resolution, noted on the floor:

> "If there ever was ground for the argument that the more specific language of article III of the Constitution should be construed as excluding judicial appointments from the general authorization given the President in article II, time has answered it. The President does have such power and this resolution does not argue otherwise." 106 Cong. Rec. 18130 (1960).

Although Article III incorporates certain protections for permanent federal judges considered vital to their independence, including life tenure, it cannot be said that judicial offices must remain vacant despite the existence of the recess power, because judges who might be appointed thereunder do not have life tenure. The evils of legislative and executive coercion which petitioner foresees have no support in our nation's history. This hypothetical risk must be weighed against the danger of setting up a roadblock in the orderly functioning of the government which would result if the President's recess power were limited by petitioner's interpretation. See 2549–2553 infra. Since we hold that Article II permits the President to appoint Justices of the Supreme Court and judges of inferior courts to serve for a limited period, it necessarily follows that such judicial officers may exercise the power granted to Article III courts.

### III.

Petitioner's argument, in the main, is that even if the President may use the recess power to appoint so-called Article III judges, he may not use that power to fill vacancies which arise while the Senate is in session. He urges that the recess power was never intended to apply to *all* vacancies; that in point of time it may be exercised only when the Senate has adjourned; and, in the plain language of the Constitution, it may be used only to fill vacancies which "happen during the Recess of the Senate." We are informed that Alexander Hamilton, in the Federalist No. 67, stated that the recess power was created for "the purpose of establishing an auxiliary method of appointment," in cases where "the general method was inadequate." Petitioner suggests, therefore, that if a vacancy occurs when the Senate is in session, the "general method" of appointment, i. e., nomination by the President with the advice and consent of the Senate, *is* adequate. In sum, we are told that the recess power can be used only if a vacancy *arises at a time* when only the

---

9. "As to the mode of appointing the judges; this is the same with that of appointing the officers of the Union in general, and has been so fully discussed in the two last numbers, that nothing can be said here which would not be useless repetition." Hamilton, Federalist No. 78.

President *alone* is available to fill it. And, since in the instant case the vacancy occurred at a time when the President and the Senate could have filled the opening in the judiciary *together,* petitioner concludes that at no time could the recess power have been employed to fill this particular vacancy. He says accordingly, that President Eisenhower's purported appointment of John M. Cashin as a District Court judge in August, 1955, was of no legal effect.

The Government replies that the interpretation of the words "happen during the Recess of the Senate" offered by petitioner is "patently strained." It asks us to interpret "happen" in this context, as meaning "happen to exist" because only that definition recognizes the "continuing nature of the state of vacancy," and accords with the true purpose of the recess power provision. That purpose, the appellee urges, is to "prevent prolonged vacancies in offices whose functions [are] necessary to the efficient and continued work of the government." It contends, therefore, that the President has power to fill vacancies existing during a recess of the Senate without regard to the time when they first arose. In this particular case, we are told, the only condition precedent to President Eisenhower's exercise of the recess power was the adjournment of the Senate on August 2, 1955. That circumstance having concededly occurred, the Government concludes that Judge Cashin's commission was valid and that petitioner's appeal is without merit.

Although constitutional interpretation does not end with the words incorporated in the fundamental charter, it necessarily begins with them. Petitioner argues forcefully that the word "happen" cannot easily be understood to mean anything but "fall open." An event "happens," and, therefore, he says the vacancy filled by Judge Cashin should be considered to have "happened" when Judge Kaufman's retirement took effect. But "the logic of words should yield to the logic of realities." [10] If we accept petitioner's definition, we must be prepared to accept his conclusion that judicial offices which are vacant on the day the Senate adjourns must remain vacant until the Senate reconvenes and has the opportunity to fill them. Moreover, this would imply a belief that the Constitution also prohibits the recess appointment of cabinet members, ambassadors, and of all other high government officers within the purview of Article II, Section 2, if vacancies in their offices existed on the day of adjournment; for we perceive nothing in the Constitution which indicates that judicial appointments are to be treated differently from any other appointments subject to Senate confirmation.

It is inconceivable that the drafters of the Constitution intended to create such a manifestly undesirable situation. If we were to adopt the petitioner's interpretation, by reading the word "happened" as if it is suspended in space without any history, context, or purpose, we would frustrate the commendable objective sought by the drafters. This can be graphically illustrated in terms of the problems posed by an appointment in the nature of the one involved in the present case. When the President receives word that a judge will soon resign or retire, he is faced with the difficult task of securing a competent replacement. The selection of a federal judge is by no means as simple as one might infer from petitioner's argument that the "general method" of appointment is adequate if vacancies occur while the Senate is in session.[10a] Inquiries must be made concerning the availabil-

10. Brandeis, J. in Di Santo v. Pennsylvania, 273 U.S. 34, 43, 47 S.Ct. 267, 71 L.Ed. 524 (1927).

10a. For an excellent discussion of the careful and difficult process pursued in selection of qualified lawyers for nomination as federal judges, see the report submitted to the American Bar Association in August 1961 by its Standing Committee on Federal Judiciary, Bernard G. Segal, Chairman. 86 Reports of American Bar Association 503, 505–508 (1961). The report evidences a Herculean undertaking by Mr. Segal and his dedicated associates

ity, competence and integrity of lawyers who might be considered for appointment. Pursuant to the practice followed in recent years, various sources of information are consulted and a large number of suggestions are received. The relative merits of the proposed appointees must be compared and weighed. After tentative selections are made, the American Bar Association (with the assistance of the local bar) conducts its own extensive investigation which includes personal interviews with the men who are being considered, and submits reports to the Attorney General and the President. In addition, the Federal Bureau of Investigation makes its report on each candidate and since the appointment must have the advice and consent of the Senate the recommendations of the candidate's Senators must be obtained and weighed by the President before a final decision is possible. Ultimately there is a nomination, but even then the task of filling the vacancy has not ended. The Senate Judiciary Committee will appoint a sub-committee to hold a hearing on the nomination which because of pressure of other Senate business may not take place for several months. The sub-committee then will report to the full committee which in turn will vote on the nomination and report to the Senate for confirmation. The entire process from selection by the President of a qualified candidate to confirmation frequently consumes many months.[10b]

on the Committee in assisting the Attorney General and the President in filling judicial places with qualified men. In the six month period prior to Mr. Segal's report his Committee had rendered a total of 174 informal and 33 formal reports or a total of 207 reports, out of a total of 282 requested by the Attorney General. Id., at 506.

10b. " * * * [I]n the 10-year period from 1948 to 1958, the average time between the creation of a vacancy and the nomination to fill it has been six and three-quarter months. During the last two years of this period, between 1956 and 1958, the average was cut to five months. This waiting period was too long, and your Committee strongly urged greater speed in the nomination process. A substantial improvement was made in the last 25 vacancies in the Eisenhower administration, when the average time between the creation of a vacancy and the forwarding of a nomination to the Senate by the President was reduced to three months [and twenty days*]. This is probably as short a period as can be hoped for, even under ideal conditions.

The process of weeding out the large number of individuals proposed for a vacancy is often difficult and always time-consuming. Although your Committee has consistently urged the greatest possible expedition in the making of nominations, we do not urge expedition in the nominating process at the expense of placing on the bench for life a single person who is not qualified to be there. Thorough investigations and reports by the Federal Bureau of Investigation, by this Committee, and by the other sources used from time to time by the Attorney General consume weeks.

More important, it is often necessary to compose sharp differences of opinion, before a name is sent to the Senate, in order that confirmation will not be held up for an inordinately long time, or even rendered impossible. This takes great effort and consumes a vast amount of time. Your Committee is convinced that such delays are inevitable.

These are the problems confronting every administration in the orderly handling of the normal number of vacancies with which it is confronted" [* typographical error]. 86 Reports of American Bar Association 503, 507 (1961).

There have been frequent instances in which considerable time has elapsed between the occurrence of a vacancy in the judiciary and the nomination of a new judge. For example, 25 months and 7 days passed before a District Judge was nominated to fill the position formerly held by Hon. C. O'Sullivan in the Eastern District of Michigan; 24 months and 23 days were required to nominate someone for a vacancy in the District of Hawaii; and a nomination was not made for the vacancy caused by the retirement of Hon. Thomas C. Trimble in the Eastern District of Arkansas for 31 months and 4 days. From February 1956 to June 1962 there were 52 instances where more than 6 months elapsed from the time of vacancy to nomination. It should be noted that these statistics do not take account of delays occurring between nomination and confirmation.

If petitioner is correct that the President's recess power is limited to vacancies which arise while the Senate is away, all this preparation must be telescoped into whatever time remains in a session if the vacancy arises while the Senate is in session. If a resignation or retirement is received late in the session, as in the present case,[11] the President must either forego the opportunity of utilizing all available sources of information and help, or leave the office unfilled for months until the Senate reconvenes. Even if this problem could be alleviated by suggesting to judges that they notify the President considerably in advance of anticipated resignations or retirements, we could hardly expect the President and Attorney General to possess prescience so that they may predict when vacancies caused by death or unexpected illness will occur.

Ironically, petitioner's interpretation of the recess power, which is intended to protect the Senate's right to properly consider judicial appointments in advance of confirmation, may very well deprive the Senate of a sufficient opportunity to fulfill its function in the appointive process. This is clearly so, for nominations submitted in the closing months of its session will leave the Senate with inadequate time to investigate the merits of the President's selection. Either it will approve such nominations *pro forma,* or it will accept the necessity of leaving the office unfilled until it reconvenes and considers the matter several months later.

If such problems are common to the appointment of judges, in which a well established routine for selection and investigation has been followed for years, what greater difficulties are to be encountered in the selection of other high government officers where extraordinary talent and expertise may be needed and the process of selection less well defined?[12]

It is no answer to suggest that the Senate could remain in session, or be recalled when necessary. It cannot be doubted that the recess power was given to the President for the precise reason that "it would have been improper to oblige this body to be continually in session for the appointment of officers." Hamilton, op. cit. supra.

If the language in Article II can be reasonably interpreted to avoid the unhappy results described, our duty to reject petitioner's definition of the word "happen" is clear. This is true notwithstanding the plausibility of his definition. As Justice Holmes astutely observed, "the interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints."[13]

We believe that the Government's interpretation of Article II is reasonable, while the petitioner's would create Executive paralysis and do violence to the orderly functioning of our complex government.

11. It is not clear from the record in this case whether Judge Kaufman's retirement, effective on the eve of the Senate's adjournment, was tendered a reasonable period in advance of that date.

12. "Put the case of a vacancy occurring in an office * * * on the last day of the Senate's session. Before the vacancy is made known to the President, the Senate rises. The office may be an important one; the vacancy may paralyze a whole line of action in some essential branch of our internal police; the public interests may imperiously demand that it shall be immediately filled. But the vacancy happened to occur during the session of the Senate; and if the President's power is to be limited to such vacancies only as happen to occur during the recess of the Senate, the vacancy in the case put must continue, however, ruinous the consequences may be to the public. Cases of this character might be easily multiplied; and it would seem to me highly desirable to avoid a construction which would produce effects so extensively pernicious, if it can be done with a just respect to the language of the constitution." 1 Ops.Att'y Gen. 631, 632 (1823).

13. Bain Peanut Co. of Texas v. Pinson, 282 U.S. 499, 501, 51 S.Ct. 228, 75 L. Ed. 482 (1931).

Our decision is not without precedent. The Attorneys-General of the United States, committed with the responsibility of advising the President concerning the scope of his constitutional powers, have held in a long and continuous line of opinions that the recess power extends to vacancies which arise while the Senate is in session. The first of these opinions was prepared in 1823 for President Monroe. Attorney General William Wirt stated:

"In reason, it seems to me perfectly immaterial when the vacancy first arose; for, whether it arose during the session of the Senate, or during their recess, it equally requires to be filled. The constitution does not look to the moment of the origin of the vacancy, but to the state of things at the point of time at which the President is called on to act. Is the Senate in session? Then he must make a nomination to that body. Is it in recess? Then the President must fill the vacancy · by a temporary commission." 1 Ops.Att'y Gen. 631, 633 (1823).

Subsequent opinions agreeing with the conclusion reached by Attorney General Wirt have considered the question in a variety of situations. The power to issue recess commissions was found to exist when, as in the present case, vacancies occurred during a session of the Senate and the interim appointment was made in the ensuing recess, 12 Ops.Att'y Gen. 449 (1868); 12 Ops.Att'y Gen. 469 (1868); 16 Ops.Att'y Gen. 522 (1880); 17 Ops.Att'y Gen. 521 (1883); 30 Ops. Att'y Gen. 314 (1914); 41 Ops.Att'y Gen. 80 (1960); when vacancies first arose during a Senate recess but the Senate failed to confirm a nomination during its succeeding session, and an interim appointment was made in the following recess, 1 Ops.Att'y Gen. 631 (1823); 2 Ops.Att'y Gen. 525 (1832); 3 Ops.Att'y Gen. 673 (1841); 4 Ops.Att'y Gen. 523 (1846); 10 Ops.Att'y Gen. 356 (1862); 12 Ops.Att'y Gen. 32 (1866); 16 Ops.Att'y Gen. 538 (1880); 19 Ops.Att'y Gen. 261 (1889); and when new offices were created by statute during a Senate session with interim commissions being issued in the succeeding recess, 12 Ops. Att'y Gen. 455 (1868); 14 Ops.Att'y Gen. 562 (1875); 18 Ops.Att'y Gen. 28 (1884).

Petitioner argues that decisions by Attorneys-General should not be given great weight when the issue to be decided is whether the President has exceeded his powers. He suggests that such opinions necessarily reflect a Presidential desire to justify this particular practice, and to construe the recess power broadly if such a construction "is at all tenable." This argument, at first blush, seems quite reasonable. But we are compelled to answer that the President and his Attorney General are sworn to uphold the Constitution. In exercising his duty to execute the laws faithfully, the President must in the first instance decide whether he acts in accordance with his constitutional powers. An objection based upon a broad interpretation of the recess power made by Presidents who have found that such power is necessary and justifiable is not well taken. The argument is reminiscent of that raised when Chief Justice Marshall's court declared its power to review acts of Congress and to determine their constitutionality. In both instances we find widespread acceptance of a practice followed since the earliest days of the Republic. Moreover, the willingness of Presidents throughout our history to follow Attorney General Wirt's interpretation of the recess power is weighty evidence of their rejection of petitioner's interpretation and the recognition that orderly functioning of government necessitated that it be so.

"* * * It is an inadmissibly narrow conception of American constitutional law to confine it to the words of the Constitution and to disregard the gloss which life has written upon them. In short, a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned, engaged in by Presidents

who have also sworn to uphold the Constitution, making as it were such exercise of power part of the structure of our government, may be treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II." Frankfurter, J. in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610–611, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) concurring opinion).

The opinions of the Attorneys-General have been accepted as conclusive authority in support of the Government's position in the single reported decision by a federal court on the question before us. See In re Farrow, 3 F. 112, 115 (C.C.N.D.Ga.1880).[14]

Petitioner protests that the price paid for this flexible interpretation of the interim appointment provision is too high. He points out that if the Government's interpretation is accepted, the President could use the recess power to avoid the necessity of securing consent of the Senate whenever he found that advisable, and not only when it was unavoidable. By waiting until the Senate adjourns he could fill judicial and other high offices with men unacceptable to the Senate. In this way he could present the Senate, after it reconvenes, with a *fait accompli,* forcing it to confirm his choice or to ignore a man already in office. Even the latter course would not help the Senate, petitioner asserts, because an interim commission expires only at the end of the session which follows its issuance, leaving open the possibility that the President could reappoint the objectionable nominee.[15] Assuming *arguendo* that all of this is possible, we are not persuaded that the risk of abuse of power outweighs the danger of Executive atrophy which would follow from petitioner's position. The petitioner concedes, "if the President had such

enormous power, it would, confidently, not be abused." We have not been directed to a single instance of behavior by any President which might be termed an "abuse" of the recess power. Petitioner's own statistics reveal that although 15 Supreme Court Justices have been originally appointed during a recess of the Senate, only one, Chief Justice Rutledge in 1795, failed to win Senate confirmation thereafter. Thus, history is eloquent proof of Attorney General Wirt's confidence that his interpretation of the recess power was "perfectly innocent." Furthermore, his analysis of the question is no less sound today than it was in the era of President Monroe. The Government's interpretation, Wirt suggested,

" * * * cannot possibly produce mischief, without imputing to the President a degree of turpitude entirely inconsistent with the character which his office implies, as well as with the high responsibility and short tenure annexed to that office; while, at the same time, it insures to the public the accomplishment of the object to which the constitution so sedulously looks—that the offices connected with their peace and safety be regularly filled." 1 Ops.Att'y Gen. 631, 634 (1823).

Finally, it is also worthy of note that Congress has implicitly recognized the President's power to fill vacancies which arise when the Senate is in session by authorizing payment of salaries to most persons so appointed under the recess power. See 5 U.S.C.A. § 56. The present statute replaces an earlier policy, adhered to before World War II, which refused payment of salaries to all recess appointees. The deterrent to abuse of power by the President conceived during the Civil War was found to be unnecessary and incongruous in an era when

14. But see the reference to an unreported and contrary decision of a lower court in the cited case at 115.

15. Petitioner also argues that the President would be able to keep judges in office who

would be stripped of the protection of life tenure. But this is merely a variation of an argument already rejected—that judges without life tenure may not exercise Article III power.

the President, without the advice and consent of the Senate in many areas, may well have the power to control the destiny of all mankind.

We hold that Judge Cashin was duly appointed a judge of the United States District Court for the Southern District of New York on August 17, 1955, under the power given to the President by Article II, Section 2 of the Constitution, and that Judge Cashin was empowered to preside over petitioner's trial. The order entered in the court below is therefore affirmed.

The Court wishes to express its gratitude to The Legal Aid Society, Anthony F. Marra, and Professor Paul Bender for their excellent presentation of the issues on this appeal.