[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**October 14, 2004**
**THOMAS K. KAHN**
**CLERK**

--------------------------------
No. 02-16424
--------------------------------
D. C. Docket No. 01-00009-CV-JTC-3

PETER EVANS,
DETREE JORDAN,

Plaintiffs-Appellees,

versus

DENIS STEPHENS,

Defendant-Appellant,

UNITED STATES OF AMERICA,

Intervenor.

--------------------------------
Appeal from the United States District Court
for the Northern District of Georgia
--------------------------------
**(October 14, 2004)**

Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON, BIRCH,
DUBINA, BLACK, CARNES,* BARKETT, HULL, MARCUS, WILSON and
PRYOR,* Circuit Judges.

_____

\*      Judge Carnes and Judge Pryor, having recused themselves on the question of Judge
Pryor's appointment, did not participate in the consideration or decision of the motion to
disqualify Judge Pryor.

**O R D E R:**

Between the twelfth and twenty-third of February 2004, the United States

Senate took a break in their Session. 150 Cong. Rec. S1414-04 (daily ed.

Feb. 12, 2004) (statement of Sen. Frist) ("I wish everyone a safe President's Day

recess"); 150 Cong. Rec. S1415-02 (daily ed. Feb. 12, 2004) (statement of Sen.

Frist) ("the Senate, at 8:49 p.m., adjourned until Monday, February 23, 2004").

During that break, on 20 February 2004, the President appointed William H. Pryor

Jr. to the Eleventh Circuit Court of Appeals. The President relied on the Recess

Appointments Clause. U.S. Const. art. II, § 2, cl. 3. In this case, plaintiff-

appellees by a timely written motion challenge the authority of Judge Pryor to act

as a United States Circuit Judge.[1] We conclude that the President's appointment

---

[1]We do not view the question of the constitutionality of Judge Pryor's appointment as affecting jurisdiction and, thus, requiring this Court to act sua sponte. We have rejected the argument that the Supreme Court's recent decision in Nguyen v. United States, 123 S.Ct. 2130 (2003), directs us to view this challenge to Judge Pryor's appointment as jurisdictional. There, the Supreme Court merely exercised its power to correct a statutory violation by the Ninth Circuit when the Circuit Court allowed a non-Article III judge to sit on a three-judge panel. The Court granted the litigant permission to appeal the issue (which had not been raised in earlier proceedings) based on its Rule 10(a) "supervisory power," not because the Court considered the issue as jurisdictional.

In addition, the Supreme Court's decision in Freytag v. Commissioner of Internal Revenue, 111 S.Ct. 2631 (1991), characterized Recess Appointments Clause objections as "nonjurisdictional structural constitutional objections." Id. at 2639 (viewing whether to address such a structural constitutional objection, despite the litigant's failure to raise the issue in lower court proceedings, as being within the Court's discretion).

This motion is the first instance -- that was both timely and ripe -- in which a party objected, on account of Judge Pryor's recess appointment, to his taking part in a decision as a judge of this Court.

was not beyond his constitutional power.

The Judicial Branch is the controlling interpreter of how the Constitution applies. But the President, in his capacity as chief executive of this country, is also sworn to uphold the Constitution. And when the President is acting under the color of express authority of the United States Constitution, we start with a presumption that his acts are constitutional.[2] See United States v. Allocco, 305 F.2d 704, 713 (2d Cir. 1962) (Recess Appointments Clause case); see also U.S. v. Nixon, 94 S.Ct. 3090, 3105 (1974) (observing "In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others."). To be sure, the presumption is a rebuttable one; but the burden is on the challengers to overcome it with their arguments and to persuade us to the contrary. Just to show that plausible interpretations of the pertinent constitutional clause exist other than that advanced by the President is not enough.

We are not persuaded that the President acted beyond his authority in this case: both the words of the Constitution and the history of the nation support the President's authority.

---

[2]We do not have before us and do not address a circumstance in which the Senate, itself, is a litigant challenging a President's act. One distinguished member of the Senate, Senator Kennedy, is acting as amicus curiae, supporting plaintiff-appellees' challenge of Judge Pryor.

<u>Recess Appointments to Article III Courts are Allowed</u>

We focus mainly on what the Constitution says and does not say. The text of the United States Constitution authorizes recess appointments of judges to Article III courts.[3] Article II, Section 2, Clause 3 of the United States Constitution specifically says "The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." The term "Vacancies" refers to the offices listed in the preceding clause: "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." In other words, Clause 2 explains the appointments the

---

[3]The sequence of the relevant clauses is important. The pertinent text of Article II, Section 2, Clauses 2 and 3 reads this way:

"[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law . . . ."

U.S. Const. art. II, § 2, cl. 2.

"The President shall have Power to fill up <u>all</u> Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session."

U.S. Const. art. II, § 2, cl. 3. (emphasis added).

President may make with Senate advice and consent; Clause 3 explains the President may make temporary appointments to "all" of these offices without Senate advice and consent. Recess appointments to the judiciary are allowed: one of the offices specifically mentioned is "Judges of the supreme Court." Appointments of United States Circuit Judges are covered. See The Federalist No. 78, at 522 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (noting that judges are to be appointed in the same manner as executive officers: "the officers of the union in general . . ."); The Federalist No. 67, at 455 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (noting that the term "Vacancies" must "be construed to relate to the 'officers' described in the preceding [clause]").

History unites with our reading to support our conclusion. As we understand it, beginning with President Washington, over 300 recess appointments to the federal judiciary (including fifteen to the Supreme Court) have been made. Historical evidence of this practice alone might not make the recess appointment constitutional, but this historical practice -- looked at in the light of the text of the Constitution -- supports our conclusion in favor of the constitutionality of recess appointments to the federal judiciary. See generally Marsh v. Chambers, 103 S.Ct. 3330, 3335 (1983) (observing that historical practice of Framers "sheds light" on the intended meaning of constitutional provisions).

Although we see some tension between Article III and the recess appointment of judges to Article III courts, we reject the argument that the language in Article III, saying that judges serve during "good Behaviour" and without a diminished salary, somehow trumps the Recess Appointments Clause. The conflict between these equally important constitutional provisions is not irreconcilable: the temporary judges appointed under the Recess Appointments Clause are an exception to the general rule of Article III. The text of the Recess Appointments Clause refers specifically to "all" vacancies: we accept that the Clause does not leave out Article III judicial vacancies.[4]

The Constitution, on its face, neither distinguishes nor limits the powers that a recess appointee may exercise while in office. That is, during the limited term in which a recess appointee serves, the appointee is afforded the full extent of authority commensurate with that office. For those who fear judicial recess appointments because the appointments bypass the Senate completely, we stress the obvious: the temporary judges lose their offices at the end of the Senate's next Session.

---

[4]There are (and always have been) few Article III judgeships for the whole country. Therefore, because an Article III judge's power cannot be delegated to other people in the way most powers of executive branch officers can be, judicial vacancies are especially hurtful to the judicial branch and, in turn, to its ability to serve the nation and its people. That the Framers would have been as concerned with keeping judicial offices filled as keeping executive offices filled makes sense.

We accept that it was the intent of the Framers to keep important offices filled and government functioning.[5]  And while recess appointees may not have every bit of the protection for their independence that regularly confirmed Article III judges have, we accept the Framers thought that what might be intolerable, if prolonged, was acceptable for a relatively short while.[6]  And, of course, plenty of the judges in this country (for example, state judges) then and now do not have all the protection of Article III judges; yet these courts are not seen to be inherently unfair, and the litigants who appear before them have not been held to have been denied due process on that account.  So, we can readily accept that the Framers would tolerate, on a temporary basis, some federal judges who lacked Article III protection.

The Second and Ninth Circuits, in reasoned opinions, have also decided that the Recess Appointments Clause reaches appointments to Article III courts. United States v. Woodley, 751 F.2d 1008 (9th Cir. 1985) (en banc); United States

---

[5]For example, Alexander Hamilton described the Recess Appointments Clause as "establishing an auxiliary method of appointment in cases, to which the general method was inadequate." The Federalist No. 67, at 455 (Alexander Hamilton) (Jacob E. Cooke ed., 1961). Sometimes, filling a vacancy should not be put off.  As Hamilton wrote, "it might be necessary for the public service [for the President] to fill [vacancies] without delay."  Id.

[6]To our knowledge, Congress has never attempted to diminish the pay of a recess-appointment judge while he was in office.  Whether such an attempt would be constitutional is itself an open question.

v. Allocco, 305 F.2d 704 (2d Cir. 1962).

"The Recess of the Senate" Includes an Intrasession Recess

Focusing first on the language of the Constitution, and then on the nation's history and on the purpose of the Recess Appointments Clause, we also conclude that President Bush appointed Judge Pryor during a legitimate Senate recess, that is, during a "Recess" within the meaning of the Recess Appointments Clause. In this case, the Senate's break fits the definition of "recess" in use when the Constitution was ratified: the dictionary definitions that have been called to our attention (or that we have found) did not, for example, speak of a minimum time. See, e.g., A Dictionary of the English Language (1755) (reprinted 1967) (defining "recess" as "retirement; retreat; withdrawing; secession" or "remission and suspension of any procedure"). And the text of the Constitution does not differentiate expressly between inter- and intrasession recesses for the Recess Appointments Clause.

The challengers have used both history and textual analysis to support their contentions that the ten- or eleven-day break in the Senate's Session that underlies Judge Pryor's appointment was not a "Recess" within the meaning of the Recess

Appointments Clause. We have considered all of the arguments. But the arguments are not so strong as to persuade us that the President's interpretation is incorrect. For example, we reject the argument that the plain meaning of the phrase, "the Recess of the Senate," limits the opportunity to make recess appointments to one particular recess: the recess at the end of a Session. We do not agree that the Framers' use of the term "the" unambiguously points to the single recess that comes at the end of a Session. Instead, we accept that "the Recess," originally and through today, could just as properly refer generically to any one -- intrasession or intersession -- of the Senate's acts of recessing, that is, taking a break. See The Random House Dictionary of the English Language 1965 (2d ed. 1987) (1966) (defining "the" as "used to mark a noun as being used generically: the dog is a quadruped"); 17 The Oxford English Dictionary, 879 (2d ed. 1989) (1928) (defining "the" as "referring to a term used generically or universally" and providing examples of such usage from the 18th Century).[7]

For another example, we are not persuaded by the argument that the Framers' use, in three other clauses, of the term "Adjournment," and not "Recess,"

_____

[7]By the way, the Constitution does not limit a term of Congress to two Sessions. One Congress had four Sessions. And several, including the first, had three Sessions. Therefore, even if the phrase "the Recess of the Senate" meant only recesses between the Sessions of the Congress (which we do not accept), there could easily be more than one such recess per Congress.

necessarily limits the meaning of "Recess" to a particular kind of break: only a break at the end of a Session. Instead of describing a block of time, the term "Adjournment" in the Constitution can be read to signify a parliamentary action: Congress's taking or having taken a break. See e.g., U.S. Const. art. I, §7, cl. 2 ("If any Bill shall not be returned by the President within ten Days . . . the Same shall be a Law . . . unless the Congress by their Adjournment prevent its Return . . .").

We know that the Supreme Court has used the term "Adjournment" in a manner that suggests that the word signifies a break period rather than signifying a means by which a break is taken. See Wright v. United States, 58 S.Ct. 395, 398 (1938). The Supreme Court there was construing the term "Adjournment" for purposes of the Pocket Veto Clause: the question of the meaning of the word "Recess" in the Recess Appointments Clause was not before the Court. We note, however, that even if the Wright Court's usage of "Adjournment" and "Recess" were directly applicable here, their usage would suggest that the term "Adjournment" is the formal break occurring at the end of a Session and that a "Recess" is something that can and does occur during a Session. See id. at 398 (noting that a three-day "recess is not an adjournment"). This usage by the Supreme Court tends to support our accepting the President's interpretation that a

10

"Recess" includes a break during a Session.

The Constitution, on its face, does not establish a minimum time that an authorized break in the Senate must last to give legal force to the President's appointment power under the Recess Appointments Clause. And we do not set the limit today. Although a President has not before appointed a judge to an Article III court during an intrasession recess as short as the one in this case, appointments to other offices -- offices ordinarily requiring Senate confirmation -- have been made during intrasession recesses of about this length or shorter.[8] Furthermore, several times in the past, fairly short intrasession recesses have given rise to presidential appointments of judges to Article III courts.[9]

Twelve Presidents have made more than 285 intrasession recess appointments of persons to offices that ordinarily require consent of the Senate. So, given the words of the Constitution and the history, we are unpersuaded by the argument that the recess appointment power may only be used in an intersession

_____

[8]For example, President Clinton appointed a judge to the Court of Federal Claims during an intrasession eleven-day recess. President Clinton made another recess appointment during an intrasession nine-day recess. President Reagan and President Coolidge made appointments during intrasession breaks of no more than thirteen-days. H. Hogue, Congressional Research Service, Intrasession Recess Appointments CRS-7 - CRS-29 (April 23, 2004).

[9]For example, President Nixon appointed three Judges to the D.C. Circuit Court of Appeals during an intrasession 32-day recess. And President Truman appointed several District Court Judges during an intrasession 35-day recess. H. Hogue, Congressional Research Service, Intrasession Recess Appointments CRS-9 - CRS-21 (April 23, 2004).

11

recess, but not an intrasession recess.  Furthermore, what we understand to be the main purpose of the Recess Appointments Clause -- to enable the President to fill vacancies to assure the proper functioning of our government -- supports reading both intrasession recesses and intersession recesses as within the correct scope of the Clause.  That an intersession recess might be shorter than an intrasession recess is entirely possible.[10]  The purpose of the Clause is no less satisfied during an intrasession recess than during a recess of potentially even shorter duration that comes as an intersession break.

<u>"Vacancies" Need Not Arise During the Recess in Order to be Filled</u>

About the phrase in the Recess Appointments Clause that speaks of filling "Vacancies that may happen during the Recess," we accept this phrase, in context, means that, if vacancies "happen" to exist during a recess, they may be filled on a temporary basis by the President.  This view is consistent with the understanding of most judges that have considered the question, written executive interpretations from as early as 1823, and legislative acquiescence.  <u>See</u> <u>United States v.</u>

---

[10]In fact, over the course of this nation's history, the Senate has effectively taken zero-day intersession recesses (at least in 1867 and 1903, the Senate did not break for an intersession recess); and the Senate has taken intrasession recesses lasting months, including one of nearly 5 months (7 August 1948 through 31 December 1948).

Woodley, 751 F.2d 1008, 1012 (9th Cir. 1985) (en banc) (noting that contrary interpretation "conflicts with a common sense reading of the word happen, as well as the construction given to this word by the three branches of our government"); United States v. Allocco, 305 F.2d 704, 709-15 (2d Cir. 1962); see also In re Farrow, 3 F.112 (N.D. Ga. 1880).

On its face, the phrase is open to more than one interpretation. For example, the word "happen" can be defined as "befall" which has been defined as "happen to be." Compare 6 Oxford English Dictionary 1096 (2d ed. 1989) (1928) with 2 Oxford English Dictionary at 62. Therefore, the phrase's most accepted interpretation (upon which the President has relied and that we too accept) does not contradict the plain meaning rule.

In addition, as we understand the history, early Presidents -- when delegates to the Constitutional Convention were still active in government -- made recess appointments to fill vacancies that originated while the Senate was in Session. For example, President Washington, during a Senate break in 1789, appointed Cyrus Griffin to fill a judgeship created during a previous Session; and President Jefferson, during a Senate break in 1801, appointed three judges to fill vacancies created during a previous Session.

Congress at least implicitly agrees with this view of recess appointments.

13

See 5 U.S.C. § 5503 (1996) (discussing salary requirements for officers appointed to fill a vacancy that existed while Senate was in session).[11]  Furthermore, interpreting the phrase to prohibit the President from filling a vacancy that comes into being on the last day of a Session but to empower the President to fill a vacancy that arises immediately thereafter (on the first day of a recess) contradicts what we understand to be the purpose of the Recess Appointments Clause: to keep important offices filled and the government functioning.[12]

## One Non-Justiciable Issue Is Presented

As judges, we have the authority and duty to construe and to apply the Constitution as it is written.  We have done so today to conclude that the Constitution gives to the President the discretionary authority to appoint a judge to

---

[11]That Congress is willing, under certain circumstances, to pay recess appointees filling vacancies that had existed while the Senate was in Session suggests to us that it is the view of the majority of Congress that the President's making of such appointments is likely not unconstitutional.  To interpret the statute's significance any other way would seem to attribute to Congress an intent to countenance what they saw as an unlawful practice.

[12]We do not agree that the different language of Article I, Section 3, Clause 2 (addressing the filling of Senate vacancies during recesses of state legislatures) shows that what has long been the common interpretation of the Recess Appointments Clause is wrong.  Nor do we agree that Hamilton's capitalization or italicization of the words "during the recess of the Senate" in Federalist 67 and 76 indicates that the vacancy to be filled (as opposed to the appointment itself) must occur in the recess.

fill a vacancy on an Article III court during a ten- or eleven-day, intrasession recess of the Senate.

Plaintiff-appellees seem to go on to contend another thing. They contend that the President misused this discretionary appointment authority in this particular instance because Judge Pryor's nomination -- before the recess appointment -- had been especially controversial and his confirmation had been blocked in the Senate. The argument, as we understand it, is that this specific recess appointment circumvented and showed an improper lack of deference to the Senate's advice-and-consent role and, thus, should not be allowed.

This kind of argument presents a political question that moves beyond interpretation of the text of the Constitution and on to matters of discretionary power, comity and good policy. These matters are criteria of political wisdom and are highly subjective. They might be the proper cause for political challenges to the President, but not for judicial decision making: we lack the legal standards -- once we move away from interpreting the text of the Constitution -- to determine how much Presidential deference is due to the Senate when the President is exercising the discretionary authority that the Constitution gives fully to him.

Conclusion

15

We are not persuaded the President exceeded his constitutional authority in a way that causes Judge Pryor's judicial appointment to be invalid. We conclude that Judge Pryor may sit with this Court lawfully and act with all the powers of a United States Circuit Judge during his term of office.[13]

**MOTION DENIED.**[14]

---

[13]Plaintiff-appellees also have moved to disqualify Judge Pryor based on his service as the Attorney General of the State of Alabama at the time of the Hope v. Pelzer, 122 S.Ct. 2508 (2002) decision and on his comments -- made before his appointment to this Court and before his taking the oath of office as a judge -- about the outcome of that case. This aspect of the motion to disqualify approaches being frivolous. Hope involved different parties and a different set of material facts than are present in this case. In addition, all or almost all judges were advocates on one side or another of many controversies before becoming judges. When they become judges, they take on an altogether different job and swear to judge "impartially." Mere representation and opinions about a previous unrelated matter -- especially made before one took the oath of office -- do not disqualify a judge. See, e.g., United States v. Outler, 659 F.2d 1306, 1312 (5th Cir. Unit B 1981), overruled on other grounds by United States v. Steele, 147 F.3d 1316 (11th Cir. 1998) (en banc). Judge Pryor's statements made as Alabama's Attorney General do not disqualify him as a judge in this Georgia case.

[14] We considered certifying to the Supreme Court the question of the validity of Judge Pryor's recess appointment. We, however, decided against that course largely because we believed our ruling on the matter would almost certainly be a speedier determination. We think that a speedier determination is best for the Court, for Judge Pryor, and for the parties that come before this Court. Had we certified the question, we had no way of knowing when the Supreme Court might get to rule on it or even if they would take the question at all. In the meantime, everyone concerned would be in a kind of legal limbo. Furthermore, it is not the nature of this Court of Appeals to blink because a case is hard or sensitive. As the Supreme Court has said, it is the "task" of a Court of Appeals "to decide all properly presented cases coming before it . . ." Wisniewski v. United States, 77 S.Ct. 633, 634 (1957) (dismissing certification). Now that we have ruled, the Supreme Court, of course, can decide for itself (and on a schedule of its own choosing) whether the issue is important enough or close enough to justify their limited time and energy in its consideration.

The public has no good reason to doubt the impartiality of our decision: our own offices are not at stake in this case; we have no financial interest in the outcome; and we did not select or appoint Judge Pryor to sit on this Court. We recognize that our associate Judge Pryor has an interest in the motion, but even the naming of a judicial colleague as a defendant in litigation

16

*For the Court:*


Underline — J.L. EDMONDSON
Chief Judge

---

(and Judge Pryor is not a defendant here) does not require automatic disqualification of every judge on the same court. Guide to Judiciary Policies and Procedures, Vol. II, Ch. IV, Published Advisory Opinion No. 103(II)(B) (2002). In addition, on the question of the constitutionality of Judge Pryor's appointment, several factors point toward our going forward to decide this case: (1) the issue concerns solely the President's recess appointment power and bears no relation to Judge Pryor's personal conduct or credibility; (2) even as to the narrow issue of the President's appointment power, the motion raises purely legal, constitutional issues based on undisputed facts and does not involve discretion or any fact-finding by this Court; (3) the motion raises mainly an issue affecting all recess appointments and not only Judge Pryor's appointment; (4) Judge Pryor is not a party to this case and has himself voluntarily recused from participating in this motion to disqualify; and (5) as noted above, our prompt resolution of this issue, as opposed to certification, best serves sound judicial administration.

By the way, no one has sought to disqualify any or all of the Article III judges of this Court from deciding this motion.

17

BARKETT, Circuit Judge, dissenting.[1]

The Constitution states that

[t]he President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate.

U.S. Const., art. II, § 2, cl. 3.  The application of this provision raises three questions.  First, can the President use the Recess Appointments Clause to fill a vacancy that did not occur during a recess?  Second, when must the President exercise his power to fill a vacancy "that may happen during the Recess"?  Third, does the phrase "the Recess" include both inter-session and intra-session recesses?  To decide on the petitioners' motion, we need only determine the answers to the first two of these questions.

The majority finds, first, that it matters not whether a vacancy <u>happens</u> during a recess, but only that it <u>exist</u> during a recess.  Second, the majority says that the President can fill any vacancy that exists during <u>one</u> recess with an appointment made during any <u>subsequent</u> recess.[2]

---

[1]It is difficult for any of us to sit in judgment on the constitutionality of a colleague's appointment.  I would have preferred to certify this question directly to the Supreme Court per 28 U.S.C. § 1254(2), or to request that the Supreme Court appoint another court to hear the matter.  Since the court has chosen to answer the question instead, I too address it.

[2]The majority unnecessarily renders a decision as to the third question, finding that "the Recess" is ambiguous enough to encompass both inter-session and intra-session recesses.  Although I would not reach this question, the text of the Constitution as well as the weight of the

18

Because I believe that the majority's conclusions conflict with the words of the Constitution, the purpose of the Recess Appointments Clause, and the structural principles underlying the Constitution's delicate balance of power between the executive and legislative branches of government, I respectfully dissent.

---

historical record strongly suggest that the Founders meant to denote only inter-session recesses. The textual point does not require much explanation. Had the Framers intended to include intra-session as well as inter-session recesses, they could very easily have used the phrase "during a recess of the Senate." They chose instead to adopt a singular construction: "the Recess of the Senate" (emphasis added). In addition, they capitalized the term "Recess," which suggests particularity rather than generality, formal rather than generic meaning.

These textual considerations are reinforced by the fact that early American legislators were forced to interrupt the work that provided their primary source of income and to travel slowly over long distances to a legislative seat. The Framers' use of the singular construction "the Recess" must be situated within this historical context.

The earliest congressional and presidential papers bear out this interpretation of the phrase "the Recess." See, for example, Journal of the Executive Proceedings of the Senate of the United States of America, 1789-1805 (February 9, 1790), at http://memory.loc.gov/ammem/amlaw/lawhome.html (last visited September 28, 2004) (Senate postponing consideration, early in the second session of the first Congress, of President Washington's message "relative to 'certain persons who decline the acceptance of offices, and to certain temporary appointments during the recess'"); President George Washington's Fifth Annual Message to Congress (December 3, 1793), at http://www.yale.edu/lawweb/avalon/presiden/sou/washs05.htm (last visited September 29, 2004) (noting, on the day after the third Congress convened to begin its first session, that the Creek Indians "have been relieved with corn and with clothing, and offensive measures against them prohibited during the recess of Congress"); and Journal of the Senate of the United States of America, 1789-1873 (May 23, 1794), at http://memory.loc.gov/ammem/amlaw/lawhome.html (last visited September 28, 2004) (Senate adoption of several amendments to a bill authorizing the President, "during the recess of the present Congress, to cause to be purchased or built a number of vessels, to be equipped as galleys in the service of the United States").

## I.  The Plain Meaning of the Constitution

The first rule of constitutional interpretation is to look to the plain meaning of the Constitution's text.  Solorio v. United States, 483 U.S. 435, 447 (1987).  See also Gibbons v. Ogden, 22 U.S. 1, 188 (1824) ("As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.") (Marshall, C.J.).

Under this rule, the plain meaning of the Recess Appointments Clause directly, expressly, and unambiguously requires that before a vacancy can be filled through the recess appointment power, that vacancy must have occurred during a Senate recess.

The majority argues that the recess power is valid to fill a vacancy already in existence at the time of the recess.  According to the majority's reading, the Constitution does not say that a vacancy, to be filled, must be created during that recess.  See Majority Order at 12 ("'Vacancies' Need Not Arise During the Recess in Order to be Filled").  But that is precisely what the Constitution does say.  The

Recess Appointments Clause applies only to those "Vacancies that may happen

during the Recess of the Senate." U.S. Const., Art. 2, § 2, cl. 3 (emphasis added).[3]

This language needs no interpretation. The text does not say that the President

shall have the power to fill all vacancies that may exist during the Recess of the

Senate. Instead, it uses the term "happen," whose plain meaning, now as it was in

the eighteenth century, is "to take place; to occur, betide, befall." Oxford English

Dictionary, 2nd ed. (1989).[4] A vacancy that "may happen during

_____

[3]On both occasions in which the text of the Recess Appointments Clause is quoted in The Federalist Papers, the phrase "*during the recess of the Senate*" is emphasized. See The Federalist No. 67, at 390 (Alexander Hamilton) (Isaac Kramnick ed., 1987) ("The President shall have power to fill up all *vacancies* that may happen *during the recess of the Senate*, by granting commissions which shall *expire at the end of their next session*."); and The Federalist No. 76, at 428 (Alexander Hamilton) (Isaac Kramnick ed., 1987) ("The President shall have power to fill up *all vacancies* which may happen *during the recess of the Senate*, by granting commissions which shall *expire* at the end of their next session."). The majority's interpretation of the clause would attribute little if any meaning to the emphasis that Alexander Hamilton places on the term "*during*" in these two papers. If anything, Hamilton's emphasis on the phrase "*during the recess of the Senate*" is inconsistent with the majority's interpretation, which would give the President the power to fill vacancies that occur even when the Senate is in session. By contrast, a reading of the clause that limits the President's power to only those vacancies that occur while the Senate is in recess seems much more faithful to Hamilton's emphasis on the word "*during*" here.

[4]The OED entry goes on to describe "happen" as the "most general verb to express the simple occurrence of an event." All of the eighteenth-century English dictionaries that I have consulted, including all those printed in America, support this reading of the term "happen." Thus, Samuel Johnson's Dictionary of the English Language (published in London in 1755) defines "happen" as "to fall out; to chance; to come to pass." William Perry's Royal Standard English Dictionary (published in London in 1775, in America in 1788) defines "happen" as "to come to pass, to light on." Thomas Sheridan's Complete Dictionary of the English Language (published in London in 1780, where it first appeared as General Dictionary of the English Language, in America in 1789) defines "happen" as "to fall out by chance; to light on by accident." John Entick's New Spelling Dictionary of the English Language (published in London in 1764, in America in 1800) defines "happen" as "to fall out, come to pass, chance." John Walker's Critical Pronouncing Dictionary and Expositor of the English Language

21

the Recess of the Senate" can only be a vacancy that takes place or occurs "during the Recess of the Senate." It clearly cannot be a vacancy that happens while the Senate is in session.

The plain meaning of the term "happen" seems all the more ineluctable when one recalls that the 1787 Constitution included not one but <u>two</u> clauses concerning recess appointments. The original Article I contained a provision for the filling of Senate vacancies that read as follows:

> [I]f Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the

---

(published in London in 1791, in America in 1803) defines "happen" as "to fall out by chance, to come to pass; to light on by accident." Samuel Johnson, Jr. and John Elliott's <u>Selected Pronouncing and Accented Dictionary</u> (published in America in 1800) defines "happen" as "to fall out, come to pass." Caleb Alexander's <u>Columbian Dictionary of the English Language</u> (published in America in 1800) defines "happen" as "to fall out, to light on." Finally, Noah Webster's <u>Compendious Dictionary of the English Language</u> (published in America in 1806), also known as "Webster's First Dictionary," defines "happen" as "to fall out, come to pass, chance."

To the extent that these definitions differ from today's usage, it is not insofar as they suggest that "exist" was a recognized synonym for "happen," for that comparison is nowhere made in any of the above dictionaries. Rather, the difference is that the eighteenth-century definitions suggest a somewhat more pronounced emphasis on the element of chance or fortuity, an emphasis entirely consistent with the plain meaning of the Recess Appointments Clause.

The majority's response to all of this evidence is simply to note that "happen" in today's usage can also mean "befall," which can also mean "happen to be." <u>See</u> Majority Order at 13. This is at best a strained effort to avoid the available dictionary evidence, and with it the plain meaning rule. A cross-reference is not a direct definition, and this reference comes from a contemporary and not an eighteenth-century dictionary. The majority provides no direct evidence from either contemporary or eighteenth-century dictionaries – and no evidence at all from any eighteenth-century dictionaries – that "happen" can mean "exist."

Legislature, which shall then fill such Vacancies.

U.S. Const., art. I, § 3, cl. 2, superseded by U.S. Const. amend. XVII. It seems difficult to imagine that the framers could have intended the term "happen" here to mean anything other than "occur" or "take place" given that the manner in which they envisioned a vacancy "happening" was "by Resignation, or otherwise." That is to say, the framers seem to have contemplated that a vacancy would "happen" when a particular triggering event occurred – whether a resignation or other event (such as a sudden illness or death) – the timing of which event could be clearly said to fall "during the Recess" of the Senate. And since there is no reason why the Framers would have intended the term "happen" to mean one thing in Article I and something different in Article II, particularly where both articles relate to the same subject of recess appointments, the majority's reading of the Article II Recess Appointments Clause seems even more difficult to reconcile with the plain meaning of the Constitution. See Whitman v. National Bank of Oxford, 176 U.S. 559, 563 (1900) ("The simplest and most obvious interpretation of a Constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption.") (internal citation and quotations omitted); National Mut. Ins. Co. of D.C. v. Tidewater Transfer Co., 337 U.S. 582, 587-88 (1949) (holding that to classify the District of Columbia as a "state" would give the word "state" as used

23

in Article III a meaning inconsistent with its use in the Constitution's other articles, and finding that "such inconsistency in a single instrument is to be implied only where the context clearly requires it").

Thus, the question of when a vacancy must occur admits of very little ambiguity. Accordingly, the plain meaning rule compels the conclusion that the Constitution means what it says: the recess appointment power of Article II is good only for those vacancies that happen while the Senate is in recess.[5]

## II. The Purpose of the Recess Appointment Power

Determining whether the President can fill a vacancy that did not occur while the Senate was in recess still leaves open the question of <u>when</u> the President can make a recess appointment itself. Contrary to what the majority holds, the

---

[5]<u>See also</u> William Rawle, <u>A View of the Constitution of the United States</u> 162-67 (2nd ed. 1829) (quoted in Ralph Lerner and Philip Kerner, eds., <u>The Founders' Constitution</u> (1987), vol. 4 at 115) ("It would be improper to pass over the construction given by the senate to the power of appointing during their recess. It has been held by that venerable body, that if new offices are created by congress, the president cannot, after the adjournment of the senate, make appointments to fill them. The vacancies do not *happen* during the recess of the senate.") (emphasis in the original); and S. Rep. No. 37-80, at 3-6 (3d. Sess. 1863) (rejecting the argument that the term "happen" in the Recess Appointments Clause can be construed to mean "happen to exist").

Constitution certainly does <u>not</u> endorse the conclusion that the President can fill a vacancy that happens during <u>one</u> recess by making an appointment during a <u>subsequent</u> recess. Where a constitutional provision is unclear or silent on a particular issue, we must look to the spirit and purpose of the provision for guidance. <u>See</u> <u>Baker by Thomas v. General Motors Corp.</u>, 522 U.S. 222, 232 (1998) (finding that the "animating purpose" of the Full Faith and Credit Clause was to "alter the status of the several states as independent foreign sovereignties" and "make them integral parts of a single nation") (internal citation omitted); <u>Katz v. United States</u>, 389 U.S. 347, 350-51, 359 (1967) (finding that one of the purposes of the Fourth Amendment is to protect the public's reasonable expectations of privacy, and holding that the admission of evidence obtained by an electronic wiretap without a warrant is unconstitutional); <u>Green v. U.S.</u>, 355 U.S. 184, 187 (1957) (emphasizing that the Double Jeopardy Clause of the Fifth Amendment was "designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense").

At the time of the founding, the purpose of the Recess Appointments Clause was to enable the President to fill vacancies that arose when the Senate is disabled from acting upon appointments. The Framers' only known discussion of the Recess Appointments Clause is <u>The Federalist No.</u> 67, by Alexander Hamilton.

Hamilton wrote:

> The relation in which [the recess appointments] clause stands to the [advice-and-consent clause], which declares the general mode of appointing officers of the United States, denotes it to be nothing more than a supplement to the other, for the purpose of establishing an auxiliary method of appointment, in cases to which the general method was inadequate. The ordinary power of appointment is confined to the President and Senate *jointly*, and can therefore only be exercised during the session of the Senate; but as it would have been improper to oblige this body to be continually in session for the appointment of officers and as vacancies might happen *in their recess*, which it might be necessary for the public service to fill without delay, the succeeding clause is evidently intended to authorize the President, *singly*, to make temporary appointments 'during the recess of the Senate, by granting commissions which shall expire at the end of their next session.'

The Federalist No. 67, at 391 (Isaac Kramnick ed., 1987) (emphasis in the original).[6]  Thus, Hamilton argues, the Framers added the Recess Appointments Clause to the Constitution in order to ensure that the President would be able to fill offices when the Senate was unable to act on the President's nominees. Nowhere does Hamilton suggest that the clause was added to allow the President to appoint someone whom the Senate might refuse to confirm.

The leading early nineteenth-century constitutional treatise, Joseph Story's Commentaries on the Constitution, reinforces this description of the purpose of the

---

[6]Hamilton's purpose in this paper was to rebut the allegation that the Constitution would have allowed the President, rather than the governors of the states, to fill vacancies in the Senate.

Recess Appointments Clause. Story notes that the recess appointment power was designed to avoid requiring the Senate to be "perpetually in session, in order to provide for the appointment of officers." As such, Story wrote, the clause was meant simply to further the interests of "convenience, promptitude of action, and general security."[7]

Without quite admitting the point in full, the majority correctly acknowledges that allowing the President to fill up vacancies in federal offices while the Senate is disabled from acting on presidential nominations is the purpose of the recess appointment power. See Order at 7 ("We accept that it was the intent of the Framers to keep important offices filled and government functioning."); id. at 12 ("[T]he main purpose of the Recess Appointments Clause [is] to enable the President to fill vacancies to assure the proper functioning of our government."). But the majority's reading of the scope of the recess appointment power is far broader than this justification allows. This is because the majority's holding gives a President the power to repeatedly circumvent the Senate's advice-and-consent role even when the Senate is not disabled from exercising that role but is, instead, perfectly capable of exercising it.

---

[7] 3 Joseph Story, Commentaries on the Constitution § 1551 (1833) (quoted in Ralph Lerner and Philip Kerner, eds., The Founders' Constitution (1987), vol. 4 at 122).

Under the majority's reading, if the Senate refuses to give its consent to a particular nominee during a particular session, there is nothing to stop a President from waiting not just until the immediately ensuing recess, but also until after the Senate has repeatedly reconvened and recessed before appointing that person through the recess appointment power. There is absolutely no reason why the Senate would not be able to exercise its advice-and-consent role over this long span of time, and yet the majority's interpretation gives a President the ability to appoint someone without regard to whether the Senate has in fact been available to consider that nominee. All that a President need worry about, under such a view, is (1) whether the Senate is in town and (2) whether there is a vacancy in a federal office.

This example suffices to show that the majority's explanation of the justification of the Recess Appointments Clause – to allow a President to fill vacancies when the Senate cannot act to confirm nominees – bears little or no relation to its reading of the scope of a President's recess appointment power. For this reading makes no attempt to limit the use of the recess appointment power to those circumstances in which the Senate is <u>in fact</u> disabled from acting on presidential nominations, even though this is the only conceivable (and indeed the only historical) justification for the recess appointment power. As Hamilton

28

emphasized in The Federalist No. 67, the recess appointment power is "nothing more than a supplement" or "auxiliary" to the "ordinary" and "general mode of appointing officers of the United States," which is "*jointly*," by way of the Senate's advice and consent. The Federalist No. 67, at 391 (Isaac Kramnick ed., 1987) (emphasis in the original). The majority's decision, however, entails that a President can fill a vacancy at any point in the future when the Senate is not in session. This cannot be correct.

### III. Structural Principles and the Separation of Powers

Where a provision of the Constitution is silent on a matter, we must also read that provision so that it will harmonize with other constitutional provisions. See Nevada v. Hall, 440 U.S. 410, 433 (1979) ("[W]hen the Constitution is ambiguous or silent on a particular issue, this Court has often relied on notions of a constitutional plan – the implicit ordering of relationships within the federal system necessary to make the Constitution a workable governing charter and to give each provision within that document the full effect intended by the Framers."). If the Constitution did not contain any other provisions concerning the appointment of federal officers, it might be possible to conclude with the

majority that a President could fill a vacancy created during one recess with an appointment made during a subsequent recess. It might even be possible to conclude that a President could fill a vacancy created during a recess <u>at any future time</u>, including when the Senate is in active session. But the Constitution does contain another provision concerning the appointment of federal officers. The Constitution states that the President

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States.

U.S. Const., art. II, § 2, cl. 2. Thus, the Constitution gives to the Senate the power to withhold its consent to any nomination to a federal office made by a President. By interpreting the Recess Appointments Clause to allow a President to fill a vacancy created during one recess with an appointment made during a subsequent recess, we are effectively allowing a President to side-step the Senate's advice-and-consent role even where the Senate is <u>not</u> disabled from fulfilling that role – which, I note again at the risk of repetition, was and still is the only reason for creating a recess appointment power.

I do not believe that the Constitution permits a President to frustrate in this way the careful separation of powers intended by the framers. In between a recess

30

during which the vacancy was created and a recess during which it is filled, the Senate would be in active session and would be perfectly capable of carrying out its advice-and-consent responsibilities. There would be no reason why the Senate would not in fact carry out those responsibilities – unless, of course, it chose not to give its consent to a particular candidate. Yet the Senate's refusal to consent to a presidential nomination does not justify the President in circumventing the text and structure of the Constitution.

Considering that the Recess Appointments Clause was intended to enable the President to fill vacancies only when the Senate was disabled from acting, and in light of the role that Article II gives the Senate in approving nominations to federal offices, there must be some more meaningful limit on the President's power to make a recess appointment than the two the majority proposes (i.e., that the Senate be in recess and that there be a vacancy to fill). The only plausible limit – as well as the most obvious one – is to require the President to fill a vacancy during the same recess in the course of which it happens. This reading is supported not only by considerations of constitutional purpose and structure, but also by the language of the Recess Appointments Clause, which suggests that the context in which the recess appointment power is triggered – the happening of a vacancy during a particular recess – also defines the limits of the recess

appointment power.  See The Federalist No. 67, at 391 (Alexander Hamilton) (Isaac Kramnick ed., 1987) ("The time within which the [recess appointment] power is to operate, 'during the recess of the Senate,' and the duration of the appointments, 'to the end of the next session' of that body, conspire to elucidate the sense of the provision . . .").

IV.  Some Additional Considerations

The Second and Ninth Circuits have ruled that the President may use the recess appointment power to fill any vacancy that exists at the time of a particular recess, even if the vacancy did not happen or occur during that same recess.  See United States v. Allocco, 305 F.2d 704 (2nd Cir. 1962); United States v. Woodley, 751 F.2d 1008 (9th Cir. 1985).  In so finding, Woodley relied essentially upon the reasoning of Allocco, which conceded that its interpretation of the recess appointment power did not reflect a literal and logical reading of the Constitution. The Allocco Court observed that, in matters of constitutional interpretation, "the logic of words should yield to the logic of realities."  Allocco, 305 F.2d at 710 (quoting Di Santo v. Pennsylvania, 273 U.S. 34, 43 (1927) (Brandeis, J., dissenting)).  By "the logic of realities," the Allocco Court had in mind the need to

avoid a situation in which "judicial offices which are vacant on the day the Senate adjourns must remain vacant until the Senate reconvenes and has the opportunity to fill them." Id. Any other result, the Allocco Court reasoned, would "create Executive paralysis and do violence to the orderly functioning of our complex government." Id. at 712.

As an initial matter, while it is a proper for an Article III court to consider the range of circumstances that its interpretation of a particular constitutional provision might cover, such consideration cannot displace the obligation to decide concrete "Cases" and "Controversies" in accordance with the plain meaning and purpose of the Constitution. See U.S. Const. art. III, § 2, cl. 1. Second, even on a purely practical note, the Allocco and Woodley argument about the dangers of governmental paralysis is more of a phantom than anything else, even in the context of our own times. The vacation of an office vital to the conduct of national security two days before the Senate goes on recess is a useful example. Despite the initial appeal of the Allocco and Woodley argument in this context, a few moments of reasoned deliberation will show that adhering to the plain meaning and purpose of the Recess Appointments Clause does not threaten in any way the President's ability to successfully manage the government during a security crisis. Common sense and practical experience tell us that the President

33

can and does call upon whichever individuals – acting officials, deputy directors, etc. – he needs to assist him in such a situation. A formal appointment is of little importance at such a time.

In contrast, there is a real, concrete concern that the understanding of the recess appointment power embraced by the majority will allow the President to repeatedly bypass the role the Framers intended the Senate to play in reviewing presidential nominees. Thus, for the reasons discussed above, the reasoning of Allocco and Woodley not only fails to adhere to the text of the Constitution, as Allocco itself acknowledged, but also makes the wrong tradeoff between executive and legislative authority, a tradeoff that comports neither with the purpose of the Recess Appointments Clause nor with the structure of the Constitution.[8]

Other than Allocco and Woodley, neither of which establishes the governing law of this circuit, the only authority the majority is able to muster for its interpretation is 5 U.S.C. § 5503 (1994). The majority characterizes this statute as a discussion of "salary requirements for officers appointed to fill a vacancy that

---

[8]It is also worth noting that Woodley makes selective and somewhat misleading use of the various eighteenth-century dictionary definitions of "happen" quoted in footnote 1 above. See Woodley, 751 F.2d at 1013 n.8. The effect is to minimize the extent to which those definitions suggest that "happen" meant "to occur" or "take place" even in the eighteenth century, and not merely in "modern" usage.

34

existed while Senate was in session" and suggests that it indicates Congress has implicitly agreed with the majority's interpretation. Order at 13-14. But 5 U.S.C. § 5503 is not a discussion of "salary requirements" at all. Rather, it provides that

> [p]ayment for services may not be made from the Treasury of the United States to an individual appointed during a recess of the Senate to fill a vacancy in an existing office, if the vacancy existed while the Senate was in session and was by law required to be filled by and with the advice and consent of the Senate, until the appointee has been confirmed by the Senate.

5 U.S.C. § 5503(a). Contrary to what the majority suggests, this statute does not indicate that Congress has impliedly consented to the majority's interpretation of the Recess Appointments Clause. Rather, the statute shows just the opposite: it shows that Congress itself has disapproved of the President's use of the recess appointment power to fill a vacancy that "existed while the Senate was in session and was by law required to be filled by and with the advice and consent of the Senate." Id.[9]

The statute goes on to set forth three very limited exceptions to the general prohibition on the payment of salaries to officers appointed in violation of the

---

[9]See S. Rep. No. 37-80 at 3-6 (3d. Sess. 1863) (explaining the rationale for the law now known as 5 U.S.C. § 5503 and rejecting the argument that the term "happen" in the Recess Appointments Clause can be construed to mean "happen to exist").

Recess Appointments Clause.[10] But those exceptions do not establish the constitutionality of the majority's interpretation: they suggest instead that Congress has simply decided to recognize the reality of an existing (and unconstitutional) practice. The exceptions to the statute only underline that Congress does not have the last word over the constitutionality of the President's use of the recess appointment power. See Marbury v. Madison, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Moreover, I do not see how these exceptions, which were added to the statute in 1940,[11] can be used to tell us anything about the meaning of

_____

[10]The statute does not apply:

(1) if the vacancy arose within 30 days before the end of the session of the Senate;

(2) if, at the end of the session, a nomination for the office, other than the nomination of an individual appointed during the preceding recess of the Senate, was pending before the Senate for its advice and consent; or

(3) if a nomination for the office was rejected by the Senate within 30 days before the end of the session and an individual other than the one whose nomination was rejected thereafter receives a recess appointment.

5 U.S.C. § 5503(a)(1-3). It also provides that any nomination to fill a vacancy described in one of those three exceptions "shall be submitted to the Senate not later than 40 days after the beginning of the next session of the Senate." 5 U.S.C. § 5503(b). As the majority also fails to acknowledge, none of the three exceptions applies to the instant case.

[11]Compare Rev. Stat. § 1761 as amended by 43 Stat. 669 (Act of June 7, 1924) with 54 Stat. 751 (1940). By contrast, the prohibition on payment of salaries to individuals appointed to fill vacancies that existed while the Senate was in session dates back to 1863. See 12 Stat. 646 (Act of February 9, 1863).

36

a constitution framed and ratified in the late 1780s. If anything, 5 U.S.C. § 5503 undermines rather than supports the majority's decision.

The statute also calls into question the Woodley Court's finding, echoed by the majority here, that "there is an unbroken acceptance of the President's use of the recess power . . . by the three branches of government." Woodley, 751 F.2d at 1011. Nor is 5 U.S.C. § 5503 the only evidence of congressional disagreement with the President's understanding of the scope of the recess appointment power. See, e.g., William Rawle, A View of the Constitution of the United States 162-67 (2nd ed. 1829) at 162-67 (quoted in Ralph Lerner and Philip Kurland, eds., The Founders' Constitution (1987), vol. 4 at 115) ("It would be improper to pass over the construction given by the senate to the power of appointing during their recess. It has been held by that venerable body, that if new offices are created by congress, the president cannot, after the adjournment of the senate, make appointments to fill them. The vacancies do not *happen* during the recess of the senate.") (emphasis in the original).

More to the point, however, even if one accepts at face value the Woodley Court's assertion of an "unbroken" history of acceptance, the failure of one branch of government to challenge how another branch understands or applies the Constitution does not render the latter's view correct. This is particularly so

where the Constitution's plain meaning, purpose, and structure all militate against accepting that view. Nor does the failure of litigants to bring constitutional challenges to the executive's use of the Recess Appointment Clause tell us anything about what the clause means. Adverse possession is a rule of property law, not constitutional law. There is no statute of limitations for interpreting and enforcing the Constitution. See Freytag v. C.I.R., 501 U.S. 868, 880, 111 S.Ct. 2631, 2639 (1991) (finding that "[n]either Congress nor the Executive can agree to waive [the] structural protection" of the Appointments Clause, and that the "structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic"); I.N.S. v. Chadha, 462 U.S. 919, 942 at n. 13 (1983) (rejecting the argument that a law dating back to 1940 is immune to the constitutional scrutiny of courts simply because it was passed by Congress and approved by the President). The President's use of the recess appointment power has been challenged on appeal only twice before, in Allocco and Woodley, both of which decisions privileged a supposed history of congressional and judicial acquiescence over the Constitution's plain meaning, purpose, and structure. The question of which should prevail – a debatable historical view or the clear import of the Constitution – has never before reached the Supreme Court.

A final observation: by invoking the political question doctrine at the end of

its order, the majority conflates the Plaintiff-Appellees' description of the

<u>circumstances</u> of Judge Pryor's appointment with the reasons for its

unconstitutionality.  <u>See</u> Majority Order at 15 ("Plaintiff-Appellees . . . contend

that the President misused [his] discretionary appointment authority in this

particular instance because Judge Pryor's nomination – before the recess

appointment – had been especially controversial and his confirmation had been

blocked in the Senate.  The argument, as we understand it, is that this specific

recess appointment circumvented, and showed an improper lack of deference to

the Senate's advice-and-consent role and, thus, should not be allowed.").  I agree

that whether the President shows an improper lack of deference to the Senate in

any given circumstance might indeed be a political question.  But that is not the

question we face.  We are asked to decide whether the President exceeded his

authority by appointing Judge Pryor.[12]  For the reasons outlined above, the

Constitution provides a clear answer to this question.  Therefore we cannot shirk

our duty to resolve this matter simply because it may have some political

---

[12]I note that the majority first claims that the motion somehow raises a separable
"political question."  However, when it comes to explaining why the court chose not to certify
the question to the Supreme Court, the majority argues that "the motion raises purely legal,
constitutional issues."  Majority Order at 17 n.14.

39

consequences. That a decision may have political consequences certainly does not make it non-justiciable under the political question doctrine. Baker v. Carr, 82 S.Ct. 691, 710 (1962) ("The doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing."). See also Chadha, 462 U.S. at 943 ("Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications").

I respectfully dissent.

WILSON, Circuit Judge, dissenting:

I dissent from the majority's decision to deny the motion of plaintiffs-appellees to disqualify Judge Pryor. Unlike the majority and Judge Barkett, I would not reach the merits of the issue, and instead would decline to exercise our discretion to entertain the motion. For the reasons that follow, I would certify the question to the Supreme Court.

The motion, which challenges Judge Pryor's authority to serve as a Circuit Judge on this Court, argues that his appointment violated the Recess Appointments Clause. Appellate courts have an obligation to review at any point whether they have jurisdiction, *Finn v. Prudential-Bache Sec., Inc.*, 821 F.2d 581, 584-85 (11th Cir. 1987), but as the majority notes, this issue is not jurisdictional. *Majority Op.* at 2, n.1. The Supreme Court has held that Appointments Clause objections are "nonjurisdictional" and thus are subject to forfeiture and waiver analysis. *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878, 111 S. Ct. 2631, 2639 (1991) (citations omitted). In *Freytag*, the Supreme Court chose to address the Appointments Clause challenge before it, but never suggested that it was compelled to do so. In fact, the majority characterized its exercise of its discretion in that case as "rare." *Id.* at 879, 111 S. Ct. at 2639. Four Justices would not have reached the merits of the claim at all. *See id.* at 892, 111 S. Ct. at

41

2646 (Scalia, J., concurring in part and concurring in the judgment, joined by Justices O'Connor, Kennedy, and Souter).

Other Supreme Court precedent supports the position that challenges to the composition of a court are non-jurisdictional. Recently, the Supreme Court dealt with a challenge to the composition of a Court of Appeals panel in *Nguyen v. United States*, 539 U.S. 69, 123 S. Ct. 2130 (2003). There, non-Article III judges sat on the panels that affirmed the petitioners' convictions. The Supreme Court exercised its supervisory power to correct the error, but did not consider the claim to be jurisdictional. *Id.* at 74, 123 S. Ct. at 2134.

Additionally, this Court thrice previously denied leave to file an amicus curiae brief raising the issue of Judge Pryor's appointment because the motion to file the brief was untimely. *See Adefemi v. Ashcroft*, No. 00-15783, *United States v. $242,484.00*, No. 01-16485, *United States v. Drury*, No. 02-12942 (11th Cir. June 10, 2004) (en banc orders). If the issue were jurisdictional, we would have been required to address it (with or without the benefit of amicus curiae). Instead, we declined to consider it because it was not raised in the proper fashion, applying ordinary rules of appellate procedure. Because the issue of Judge Pryor's

appointment is not a jurisdictional one, we are not obligated to address it.[1]

There are compelling reasons why the proper course of action is to decline to exercise our discretion to address this issue. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S. Ct. 1319, 1323 (1988). The outcome of the underlying appeal – an important case concerning strip searches and qualified immunity – does not depend on the resolution of this motion. We would not have discretion to avoid the close constitutional questions surrounding the propriety of Judge Pryor's appointment if they were determinative of an appeal, but that is not the situation facing us.[2] Unless and until we cannot avoid the question, notions of judicial restraint counsel against striving to decide constitutional issues. *See Elk Grove Unified Sch. Dist. v. Newdow*, ___ U.S. ___, ___, 124 S. Ct. 2301, 2308-09 (2004) (discussing similar principles underlying the

---

[1]The only circuit courts to have addressed the recess appointments of Article III judges diverge on this point. The Second Circuit did not consider the issue to be jurisdictional. *United States v. Allocco*, 305 F.2d 704, 707-08 & n.8 (2d Cir. 1962) (permitting a "departure" from normal waiver rules). The Ninth Circuit raised the issue sua sponte because it felt the question was a "jurisdictional problem[]." *United States v. Woodley*, 751 F.2d 1008, 1009 n.2 (9th Cir. 1985) (en banc). If, as I suggest, we were to certify the matter to the Supreme Court, one of the questions certified could be whether the challenge at issue is jurisdictional.

[2]I can envision situations in which the propriety of Judge Pryor's appointment would be the determinative question, but I need not expound upon those situations here.

concept of prudential standing, including "[t]he command to guard jealously and exercise rarely our power to make constitutional pronouncements").

Another important concern militates against the majority's decision to reach the merits of the motion. It is simply inappropriate for the members of a court to sit in judgment of a colleague's legitimacy. In the only two courts of appeals decisions addressing the recess appointment of Article III judges, circuit judges reviewed the appointment of district judges. *See United States v. Woodley*, 751 F.2d 1008 (9th Cir. 1985) (en banc); *United States v. Allocco*, 305 F.2d 704 (2d Cir. 1962). The mandate to review lower-court judgments is the fundamental characteristic of appellate courts. But it is nearly anathema for circuit court judges to review a colleague's legitimacy to sit as a member of their court.[3]

My specific concern is twofold. First, we risk damaging the collegiality for which this Court is rightly known. Even our most vociferous dissents are critiques of a judge's legal reasoning in a particular case, and never (one hopes) devolve into personal rebukes. And while the recess appointment question in the motion before us is, in the strictest sense, a matter of constitutional interpretation that does

---

[3]The only instance where we sit in judgment of each other's opinions is when the en banc court overturns a prior court decision. But even on these rare occasions, we do not review the prior court's legitimacy. Ordinarily, of course, panels of the Court are bound by a prior panel's decision. Although the reason for this is stare decisis, it also prevents a great deal of disharmony that might result if panels of the Court were constantly overturning each other's decisions.

not depend on the judge involved, it is inescapable that this is not a question we can answer in the abstract.  A vote in favor of the legal argument presented in the motion is also a vote against Judge Pryor's membership on our Court.[4]  Moreover, even if such a decision were cast as a ruling that the President overstepped his authority under the Recess Appointments Clause, it might also be construed as a judgment that Judge Pryor should not have accepted the appointment in the first place.

Imagine the risk to our collegiality if we granted the motion, but Judge Pryor did not accept our ruling.  He might decide to file in the Supreme Court a petition for a writ of mandamus compelling us to restore him to the Court.  I should stress that I have no doubt that Judge Pryor would do anything but abide by any decision of this Court, but even the slightest risk that a judge might sue his colleagues should compel us to make every effort to avoid such confrontations.  Because it seems impossible to me to avoid the very personal impact of any decision we make, it is neither wise nor prudent for us to make one.

Second, we risk public confidence in the judiciary as an institution.  As of September, 2004, Judge Pryor has authored 8 published opinions and 42

_____

[4]Indeed, one portion of the motion is not abstract at all, but asserts that *this particular appointment* is unconstitutional.  *See* Majority Op. at 14-15 (determining that this issue is a non-justiciable political question).

45

nonpublished opinions. As of September 30, 2004, Judge Pryor has participated as a member of a panel in 299 appeals, 40 of which were decided after oral argument. In fact, Judge Pryor has already sat en banc with the full Court and has participated in en banc decisions. Any decision we make on this motion risks undermining public confidence in the Court. On the one hand, if we grant the motion to disqualify Judge Pryor in this case because he was not validly appointed to the Court, we would necessarily imply that he improperly sat in previous cases. This would instantly call into question every one of those decisions. *See Nguyen*, 539 U.S. at 82-83, 111 S. Ct at 2138-39 (an improperly constituted court of appeals panel required reversal of conviction, even though opinion affirming conviction was unanimous, and in some circumstances could have been filed by a two-judge quorum). Although it is not unheard of for us to overturn prior decisions, if we granted the motion the public might reasonably wonder why we allowed so many illegitimate decisions to be entered at all.

Conversely, if we deny the motion, the public might reasonably wonder about our motives. I have detailed above the concerns for collegiality that should be present in this case. An observer might assume that a desire to protect collegial relations, or a personal affinity for Judge Pryor developed over the course of his service to our Court, might have weighed in the decision not to remove him. As

discussed, the impact of our decision will be very deeply felt by Judge Pryor. Judges are human, and we cannot risk giving the impression that our desire to avoid confrontation and maintain collegiality affected our decision. Because of the problems inherent in sitting in judgment of one's colleague, we should avoid imperiling public confidence in the Court.

As a final note, I hasten to add that I do not mean to suggest that *no one* should answer the difficult constitutional questions arising from recess appointments. I merely submit that in the present case, it should not be this Court. While the common law "rule of necessity" would prevent the Supreme Court from avoiding a decision on the legitimacy of a Justice's recess appointment, that rule only applies to courts of last resort or where no judge at all would be available. *See United States v. Will*, 449 U.S. 200, 212-216, 101 S. Ct. 471, 479-81 (1980) (discussing the history and application of the rule of necessity). The rule does not apply when recourse may be had in a higher court. Such is the case before us. The Supreme Court can address the merits of the recess appointment issue free of the concerns facing us if we pass judgment on a colleague. Just as we sit in review of the district courts, so the Supreme Court sits in review of us.

In light of the unique – indeed, unprecedented – circumstances of this motion to rule on the legitimacy of a colleague's presidential appointment, the

most prudent course for us to take is to decline to reach the merits of the motion.

Instead, as Judge Barkett suggests, we should certify the question to the Supreme

Court pursuant to 28 U.S.C. § 1254(2) (2000).  *See* Dissenting Op. of Judge

Barkett at 1 n.1; *see also United States v. Penaranda*, 375 F.3d 238, 247 (2d Cir.

2004) (certifying questions to the Supreme Court).[5]  From the majority's decision

to address the merits of the motion, I respectfully dissent.

---

[5]The Second Circuit in *Penaranda* certified to the Supreme Court questions arising from the Supreme Court's decision in *Blakely v. Washington*, ___ U.S. ___, 124 S. Ct. 2531 (2004). Crucial to the Second Circuit's decision was that *Blakely* impacted so many criminal cases, and efficient administration of justice required prompt answers to questions about the scope of *Blakely*.  Similar concerns are present here.  As noted, every case involving Judge Pryor is cast into doubt until the questions presented in the motion are finally settled by the Supreme Court. The sooner it rules on the validity of Judge Pryor's appointment, the better.  Certification not only allows us to avoid sitting in judgment of a colleague's legitimacy, it also facilitates Supreme Court consideration of the issue as soon as possible, to the benefit of both this Court and litigants before it.  The majority contends that its decision today is the "speedier determination."  Majority Op. at 16 n.14.  To the contrary, I believe that the most rapid course we could have taken would have been to certify the matter as soon as the motion was originally filed.  The Supreme Court would likely have decided whether to accept certification sooner than it would take to decide a petition for certiorari following our decision.