*1009 BEEZER, Circuit Judge:
We take this case en banc to address the constitutionality of a practice followed by the Executive for nearly 200 years. The question before us is whether the President of the United States may constitutionally confer temporary federal judicial commissions during a recess of the Senate pursuant to article II, section 2 of the Constitution.
I
On February 28, 1980, Walter Heen was nominated to fill a judicial vacancy in the United States District Court for Hawaii. The Senate Judiciary Committee began confirmation hearings on his nomination on September 25, 1980. When the Senate recessed on December 16, 1980, testimony and hearings on the nomination were complete, but the nomination did not come before the full Senate for its advice and consent. During the Senate’s recess, on December 31, 1980, President Carter conferred a commission on Judge Heen pursuant to the recess appointment clause of article II of the United States Constitution. Heen then took his oath and assumed his duties as district court judge. On January 21, 1981, Heen’s nomination was withdrawn by President Reagan. Heen continued sitting as a district judge pursuant to his recess commission until December 16, 1981, when the 97th Congress ended its First Session.[1]
On September 18, 1981, while Heen was sitting out his commission, appellant Janet Woodley was indicted on three counts of narcotics violations. Woodley filed a motion to suppress evidence, which was denied by Heen. Judge Heen then presided over a bench trial on stipulated facts and found Woodley guilty as charged in the indictment.
Woodley appealed the denial of her motion to suppress. A panel of this court raised the issue sua sponte whether Judge Heen could constitutionally preside over Woodley’s trial.[2] The panel held that he could not and it vacated Woodley’s conviction. United States v. Woodley, 726 F.2d 1328, 1339 (9th Cir.1983). The court having convened en banc, United States v. Woodley, 732 F.2d 111 (9th Cir.1984) (order granting rehearing en banc), we hold that the recess appointment clause extends to judicial officers and that a recess appointee to the federal bench can exercise the judicial power of the United States.
II
The recess appointment clause provides that: “The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.” U.S. Const, art. II, § 2, cl. 3. Article III, in turn, provides in relevant part that: “The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services a Compensation, which shall not be diminished during their Continuance in Office.” U.S. Const, art. Ill, § 1.
Woodley contends that under generally accepted principles of statutory construction, the more specific language of article III governs over the general language of the recess appointment clause. She concludes therefore that article III forbids interim judicial recess appointments. We reject this argument.
The United States Supreme Court has unequivocally stated that “[t]he Constitu *1010 tion ... must be regarded as one instrument, all of whose provisions are to be deemed of equal validity.” Prout v. Starr, 188 U.S. 537, 543, 23 S.Ct. 398, 400, 47 L.Ed. 584 (1903). Moreover, while article III speaks specifically about the tenure of federal judges, article II is equally specific in addressing the manner of their appointment. There is therefore no reason to favor one Article over the other.
The language of the recess appointment clause explicitly provides that the President has the power to fill all vacancies during the recess of the Senate. The Federalist papers clarify the meaning of the recess clause, stating that it “is to be considered as supplementary to the [clause] which precedes” and that the vacancies referred to “must be construed to relate to the ‘officers’ described in the preceding [clause].” The Federalist No. 67, at 455 (A. Hamilton) (J. Cooke ed. 1961). The preceding clause in question provides in relevant part that the President “shall nominate, and by and with the Advice and Consent of the Senate shall appoint ... Judges of the supreme Court, and all other Officers of the United States_” U.S. Const, art. II, § 2, cl. 2 (emphasis added). This language further underscores that there is no basis upon which to carve out an exception from the recess power for federal judges. Particularly relevant in this context is Alexander Hamilton’s statement that “[a]s to the mode of appointing the judges: This is the same with that of appointing the officers of the union in general.... ” The Federalist No. 78, supra, at 522.[3]
Ill
Woodley also argues that there is no historical evidence that the Framers intended the recess provision to apply to the judiciary. This argument is not only refuted by the express language of the recess clause, which, as previously noted, refers to all vacancies, but it is also refuted by legislative history, as well as historical practice, consensus, and acquiescence.
Although the recess appointment clause was adopted without debate, 2 Farrand, Records of the Federal Convention 533, 540 (1911), there is evidence that it was not entirely uncontroversial. Edmund Randolph, the governor of Virginia, initially declined to sign the Constitution, in part because the recess provision gave the Executive the power to confer judicial commissions during the recess of the Senate. 3 Farrand, supra, at 123, 127.
In 1789, shortly after ratification of the Constitution, George Washington, who had served as President of the Constitutional Convention, exercised his power under the recess provision. During the recess between the sessions of the First Congress, he conferred three recess district judge commissions. 30 The Writings of George Washington, 457-58, 473, 485 n. 75 (J. Fitzpatrick ed. 1939). At the time of these appointments, Edmund Randolph and two contributors to The Federalist, Alexander Hamilton and John Jay, served as members of President Washington’s Cabinet. There is no evidence that they doubted the constitutionality of the recess appointments.[4] Moreover, the district court judges were confirmed upon the return of the Senate without objection to their recess appointments. 1 Executive Journal of the Seriate 38, 40 (1790). It is further noteworthy that President Washington’s recess appointments of Justice Johnson in 1791 and of Chief Justice Rutledge in 1795 went unchallenged.[5] One commentator has aptly *1011 noted that “the most significant historical fact is that by the end of 1823, there had been five recess appointments to the Supreme Court. During this period, when those who wrote the Constitution were alive and active, not one dissenting voice was raised against the practice.” Note, Recess Appointments to the Supreme Court — Constitutional But Unwise?, 10 Stan.L.Rev. 124, 132 (1957).
The actions of the three branches of our government have consistently confirmed the President’s power to make recess appointments. The Executive Branch has made extensive use of the recess power. Approximately 300 judicial recess appointments have been made in our nation’s history.[6] Presidents Eisenhower and Kennedy alone made fifty-three such appointments during their Administrations. See H. Chase, Federal Judges The Appointing Process 86-88, 114-15 (1972).
The Legislative Branch has consistently confirmed judicial recess appointees without dissent. Moreover, Congress has passed legislation providing for the salaries of recess appointees, without excluding judges. 5 U.S.C. § 5503; see also S.Res. 334, 86th Cong., 2d Sess., 106 Cong.Rec. 18,130-45 (1960) (statement of Senator Hart) (confirming President’s power to make judicial recess appointments).
Finally, we turn to the Judicial Branch. The only direct challenge, prior to the present action, to the President’s power to make judicial recess appointments was rejected by the Second Circuit in United States v. Allocco, 305 F.2d 704 (2d Cir.1962), cert. denied, 371 U.S. 964, 83 S.Ct. 545, 9 L.Ed.2d 511 (1963). Although the United States Supreme Court has never passed on the issue, numerous Justices have been recess appointees. Chief Justice Rutledge sat as a recess appointee for six months and participated in two decisions. He delivered the opinion of the Court in United States v. Peters, 3 U.S. (3 Dall.) 96, 1 L.Ed. 535 (1795) and wrote with the majority in Talbot v. Jansen, 3 U.S. (3 Dall.) 105, 1 L.Ed. 540 (1795). Justice Curtis, who received a recess appointment in 1851, sat as a judge of the Circuit Court of the United States for the First Circuit and the Rhode Island District Court, while he was a recess appointee. See Note, supra, at 131 n. -24. Altogether, fifteen recess appointments have been made to the Supreme Court. Staff of House Comm, on the Judiciary, 86th Cong., 1st Sess., Recess Appointments of Federal Judges 40 (Comm. Print 1959). Of these, at least four appointees sat on the Court prior to their confirmation. Note, supra, at 125. There is no evidence that any member of the Supreme Court ever objected to this practice on constitutional grounds.
IV
Our historical review demonstrates that there is an unbroken acceptance of the President’s use of the recess power to appoint federal judges by the three branches of government. Woodley argues, however, that the Supreme Court’s recent decision in INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), teaches that historical patterns cannot save an unconstitutional practice.
We agree that historical acceptance alone cannot conclusively establish a practice’s constitutionality. Yet while we rely only in part on historical consensus in upholding the President’s authority to make judicial recess appointments, we cannot ignore historical observance. The teachings of Cha-dha are not to the contrary. That case held that historical acceptance of the legislative veto could not prevent it from running afoul of the Constitution. 103 S.Ct. at 2279 n. 13. The legislative veto is, however, a recent practice, barely 50 years old. Its use does not reach back to the days of the Framers, such as the practice at issue. Moreover, it is an impermissible statutory *1012 methodology, unsupported by an express constitutional grant of authority. While the use of the recess clause to make temporary judicial appointments has been accepted by all three branches of government for nearly 200 years, the relatively young legislative veto has been referred to by the United States Supreme Court as “the most recent episode in a long tug of war between the Executive and Legislative Branches_” Buckley v. Valeo, 424 U.S. 1, 140 n. 176, 96 S.Ct. 612, 692 n. 176, 46 L.Ed.2d 659 (1976) (per curiam).[7]
The United States Supreme Court has made clear that considerable weight is to be given to an unbroken practice, which has prevailed since the inception of our nation and was acquiesced in by the Framers of the Constitution when they were participating in public affairs. See, e.g., United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 322, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936); J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 412, 48 S.Ct. 348, 353, 72 L.Ed. 624 (1928); Stuart v. Laird, 5 U.S. (1 Crunch) 185, 191, 2 L.Ed. 115 (1803). This principle was reaffirmed by the Court less than a month after Chadha. In Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), Chief Justice Burger, who also authored Chadha, noted that “[i]n light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society.” Marsh, 103 S.Ct. at 3336. Much in the same way, the use of the recess provision to appoint federal judges has been inextricably woven into the fabric of our nation.
V
Woodley says that a technical argument could be made that the language of the recess clause giving the President the power to fill all vacancies that “may happen during the Recess of the Senate,” means that only those vacancies that occur during the recess itself can be filled by Presidential appointment. She reasons therefore that Judge Heen’s appointment is invalid, because the vacancy which he filled did not occur during a recess of the Senate. Woodley’s interpretation conflicts with a common sense reading of the word happen, as well as the construction given to this word by the three branches of our government.
In a vacuum, the use of the word happen could be interpreted to refer to vacancies that either “happen to occur” or “happen to exist” during a recess of the Senate.[8] Yet the former interpretation would lead to the absurd result that all offices vacant on the day the Senate recesses would have to remain vacant at least until the Senate reconvenes. Not only judicial positions, but all offices within the purview of article II, § 2, clause 2 would have to remain vacant. The positions of cabinet members and other high government officials would have to remain unfilled until the return of the Senate. If a vacancy occurred on the last day before the Senate’s recess, the President would be without power to fill that vacancy in the ensuing recess. Even assuming that the Senate was informed of the vacancy prior to its recess and the *1013 President submitted a timely nomination, the Senate would still be faced with the dilemma of either confirming a candidate of whose qualifications little is known or leaving that office vacant until the Senate reconvenes. , We agree with the Second Circuit that this interpretation “would create Executive paralysis and do violence to the orderly functioning of our complex government.” Allocco, 305 F.2d at 712; see also Note, supra, at 126 (apparent purpose of recess clause “was to assure the President the capacity for filling vacancies at any time to keep the Government running smoothly”). We cannot attribute to the Framers an intent to create such a potentially dangerous situation. See South Carolina v. United States, 199 U.S. 437, 449, 26 S.Ct, 110, 111, 50 L.Ed. 261 (1905).
We also emphasize that both the courts and the Executive Branch have consistently construed the recess clause as giving the President the authority to fill all vacancies that exist while the Senate is in recess. See, e.g., Allocco, 305 F.2d at 712-15 (President may make appointments to all vacancies that exist during a Senate recess); In re Farrow, 3 Fed. 112, 116 (N.D.Ga.1880) (President has power to make appointments “notwithstanding the fact that the vacancy filled by his appointment first happened when the senate was in session.”); 1 Op.Att’y Gen. 631, 633 (1823) (“[WJhether [a vacancy] arose during the session of the Senate, or during their recess, it equally requires to be filled.”); 2 Op.Att’y Gen. 525, 528 (1832) (President may make recess appointments “ ‘if there happen to be any vacancies during the recess.’ ”); 19 Op. Att’y Gen. 261, 263 (1889) (“[w]herever there is a vacancy there is a power to fill it.”) (emphasis in original).
Both Houses of Congress have apparently recognized the soundness of this construction of the recess power. See Nomination of Charles Beecher Warren to be Attorney General, 67 Cong.Rec. 263-64 (1925).(recognizing President’s power to fill vacancies regardless of when they arose); 52 Cong.Rec. 1369-70 (1915) (statement of Congressman Borland) (recognizing power of president to fill vacancies that occurred during a previous session of the Senate). Moreover, Congress has provided for payment of recess appointees, such as Heen, whose nominations were pending at the time of the Senate’s recess. 5 U.S.C. § 5503(a)(2). We therefore decline to adopt Woodley’s “happen to occur” argument and .recognize the President’s power to fill all vacancies that exist during a recess of the Senate.
VI
Finally, we address Woodley’s related arguments that the recess appointment clause is merely a “housekeeping measure” and that Judge Heen lacks the attributes of an article III judge contrary to the teachings of Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).
In Marathon, Justice Brennan’s plurality opinion held that Congress may not, through a statute, constitutionally vest the non-article III adjunct bankruptcy judges with article III powers. Id. at 87, 102 S.Ct. at 2880.[9] Yet the present case is not concerned with an attempt to circumvent article III by statute, but with the scope of an express constitutional provision. Moreover, the recess appointment clause is not simply a statutory solution to a judicial problem or a mere housekeeping measure. The clause prevents the Executive from being incapacitated during the recess of the Senate. This in turn prevents extended judicial vacancies, which can cause the denial of the important right of access to the courts. The Framers considered the recess appointment clause sufficiently important to include it in the Constitution. In the early days of the Republic, travel time was measured in days, not hours, and extended congressional recesses were expected. The advent of modern jet travel, instant communication, and present day prolonged sessions of Congress do not justify character *1014 izing the recess appointment clause merely as a housekeeping measure.
A recess appointee lacks life tenure and is not protected from salary diminution. As a result, such an appointee is in theory subject to greater political pressure than a judge whose nomination has been confirmed. Yet our Constitution has bestowed upon the Executive the power to make interim judicial appointments. This power is not unfettered, however, but is subject to its own limitations and safeguards. It may only be invoked when the Senate is in recess, and recess commissions expire at the end of the next congressional session. U.S. Const. art. II, § 2, cl. 3; see Staebler v. Carter, 464 P.Supp. 585, 597 (D.D.C.1979). We must therefore view the recess appointee not as a danger to the independence of the judiciary, but as the extraordinary exception to the prescriptions of article III. Cf. Marathon, 458 U.S. at 70, 102 S.Ct. at 2871 (certain exceptional powers bestowed upon Congress by Constitution not subject to prescriptions of article III). The judicial recess appointee, who has sworn to uphold the Constitution, fills a void left by those preceding in office, thereby permitting the unbroken orderly functioning of our judicial system.
It should also be noted that as a practical matter, a recess appointee could not be a “lion under the throne,” subject to the whims of the President. 28 U.S.C. § 144 (bias or prejudice of a judge). “The evils of legislative and executive coercion ... have no support in our nation’s history.” Allocco, 305 F.2d at 709.
YII
Even viewing the recess clause as an unwise constitutional provision, it is not for this court to redraft the Constitution. Changes in that great document must come through constitutional amendment, not through judicial reform based on policy arguments. Accordingly, we hold that Judge Heen, as a recess appointee to the federal bench, could exercise the judicial power of the United States.
The case is remanded to the panel for determination on the merits.
BROWNING, Chief Judge, SNEED, SKOPIL, FARRIS, ALARCON and POOLE, Circuit Judges, concurring.

. Withdrawal of Judge Heen’s nomination, standing alone, did not impair his authority to sit as a district court judge. See U.S. Const. art. II, § 2, cl. 3; see also In re Marshalship for the Southern and Middle Districts of Alabama, 20 Fed. 379, 382 (N.D.Ala.1884) (recess commission continues until end of next session of Congress).

. Although the recess appointment issue was not raised by the parties, this court must examine jurisdictional problems sua sponte. Miller v. Transamerican Press, Inc., 709 F.2d 524, 527 n. 2 (9th Cir.1983). The case at bar presents such a jurisdictional issue and is subject to our review. See, e.g., Glidden Co. v. Zdanok, 370 U.S. 530, 536, 82 S.Ct. 1459, 1465, 8 L.Ed.2d 671 (1962).

.The United States Supreme Court has noted that "[t]he opinion of [The Federalist] has always being considered as of great authority ... and the part two of its authors performed in framing the constitution, put it very much in their power to explain the views with which it was framed.” Cohens v. Virginia, 19 U.S. (6 Wheat.) 120, 187, 5 L.Ed. 257 (1821).

. Randolph, who was Attorney General, was advised by President Washington of Judge Griffin’s recess appointment. See 30 Writings of George Washington, supra, at 472-73. Secretary of State Jay, in turn, had the duty to seal all civil commissions. See Marbury v. Madison, 5 U.S. (1 Cranch.) 87, 98, 2 L.Ed. 60 (1803).

. Although Rutledge was not ultimately confirmed, it was not because he was a recess *1011 appointee, but because of his opposition to the Jay Treaty. See Ex parte Ward, 173 U.S. 452, 454 n. 1, 19 S.Ct. 459, 43 L.Ed. 765 (1899).

. These statistics were compiled from the files of the Office of the Deputy Attorney General at our request.

. The first legislative veto provision was challenged shortly after its passage. See 37 Op. Att’y Gen. 56, 63-64 (1933). Eleven Presidents have gone on record challenging the Congressional veto power as unconstitutional. Chadha, 103 S.Ct. at 2779 n. 13.

. English language dictionaries of the Seventeenth, Eighteenth and Nineteenth centuries shed little light on this issue. See, e.g., Cole’s Dictionary (1692) (defining “hap” as "to catch or snatch”); Blount's Dictionary (2d ed. 1719) (defining "happe” as to "match or catch”); Bailey’s Dictionary (1737) (“to fall out"); Sheridan’s English Dictionary (2d ed. 1789) (“To fall out by chance, to come to pass; to light on by accident”); 1 Webster’s Dictionary (1828) ("To come by chance,” "to come, to befall,” "to light”); Richardson’s English Dictionary (1839) (“Any thing, something, that comes or falls into our hold or possession, any thing caught; chance accident, luck.”) It is noteworthy, however, that it is only in modern usage that happen has come to signify merely "to take place or occur.” Webster’s New International Dictionary (2d ed. 1934).

. Justice Brennan was himself a recess appointee.