BARKETT, Circuit Judge,
dissenting[1]:
The Constitution states that
[t]he President shall have Power to fill up all Vacancies that'may happen during the Recess of the Senate.
U.S. Const., art.. II, § 2, cl. 3. The application of this provision raises three questions. First, can the President use the Recess Appointments Clause to fill a vacancy that did not occur during a recess? Second, when must the President exercise his power to fill a vacancy “that may happen during the Recess”? Third, does the phrase “the Recess” include both intersession and intra-session recesses? To decide on the petitioners’ motion, we need only determine the answers to the first two of these questions.
The majority finds, first, that it matters not whether a vacancy happens during a recess, but only that it exist during a recess. Second, the majority says that the President can fill any vacancy that exists during one recess with an appointment made during any subsequent recess.[2]
*1229 Because I believe that the majority’s conclusions conflict with the words of the Constitution, the purpose of the Recess Appointments Clause, and the structural principles underlying the Constitution’s delicate balance of power between the executive and legislative branches of government, I respectfully dissent.
I. The Plain Meaning of the Constitution
The first rule of constitutional interpretation is to look to the plain meaning of the Constitution’s text. Solorio v. United States, 483 U.S. 435, 447, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987). See also Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 188, 6 L.Ed. 23 (1824) (“As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.”) (Marshall, C.J.).
Under this rule, the plain meaning of the Recess Appointments Clause directly, expressly, and unambiguously requires that before a vacancy can be filled through the recess appointment power, that vacancy must have occurred during a Senate recess.
The majority argues that the recess power is valid to fill a vacancy already in existence at the time of the recess. According to the majority’s reading, the Constitution does not say that a vacancy, to be filled, must be created during that recess. See Majority Order at 1226 (“ ‘Vacancies’ Need Not Arise During the Recess in Order to be Filled”). But that is precisely what the Constitution does say. The Recess Appointments Clause applies only to those ‘Vacancies that may happen during the Recess of the Senate.” U.S. Const., Art. 2, § 2, cl. 3 (emphasis added).[3] This language needs no interpretation. The text does not say that the President shall *1230 have the power to fill all vacancies that may exist during the Recess of the Senate. Instead, it uses the term “happen,” whose plain meaning, now as it was in the eighteenth century, is “to take place; to occur, betide, befall.” Oxford English Dictionary, 2nd ed. (1989).[4] A vacancy that “may happen during the Recess of the Senate” can only be a vacancy that takes place or occurs “during the Recess of the Senate.” It clearly cannot be a vacancy that happens while the Senate is in session.
The plain meaning of the term “happen” seems all the more ineluctable when one *1231 recalls that the 1787 Constitution included not one but two clauses concerning recess appointments. The original Article I contained a provision for the filling of Senate vacancies that read as follows:
[I]f Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies.
U.S. Const., art. I, § 8, cl. 2, superseded by U.S. Const, amend. XVII. It seems difficult to imagine that the framers could have intended the term “happen” here to mean anything other than “occur” or “take place” given that the manner in which they envisioned a vacancy “happening” was “by Resignation, or otherwise.” That is to say, the framers seem to have contemplated that a vacancy would “happen” when a particular triggering event occurred— whether a resignation or other event (such as a sudden illness or death) — the timing of which event could be clearly said to fall “during the Recess” of the Senate. And since there is no reason why the Framers would have intended the term “happen” to mean one thing in Article I and something different in Article II, particularly where both articles relate to the same subject of recess appointments, the majority’s reading of the Article II Recess Appointments Clause seems even more difficult to reconcile with the plain meaning of the Constitution. See Whitman v. National Bank of Oxford, 176 U.S. 559, 563, 20 S.Ct. 477, 44 L.Ed. 587 (1900) (“The simplest and most obvious interpretation of a Constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption.”) (internal citation and quotations omitted); National Mut. Ins. Co. of D.C. v. Tidewater Transfer Co., 337 U.S. 582, 587-88, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) (holding that to classify the District of Columbia as a “state” would give the word “state” as used in Article III a meaning inconsistent with its use in the Constitution’s other articles, and finding that “such inconsistency in a single instrument is to be implied only where the context clearly requires it”).
Thus, the question of when a vacancy must occur admits of very little ambiguity. Accordingly, the plain meaning rule compels the conclusion that the Constitution means what it says: the recess appointment power of Article II is good only for those vacancies that happen while the Senate is in recess.[5]
II. The Purpose of the Recess Appointment Power
Determining whether the President can fill a vacancy that did not occur while the Senate was in recess still leaves open the question of when the President can make a recess appointment itself. Contrary to what the majority holds, the Constitution certainly does not endorse the conclusion that the President can fill a vacancy that happens during one recess by making an appointment during a subsequent recess. Where a constitutional provision is unclear or silent on a particular issue, we must *1232 look to the spirit and purpose of the provision for guidance. See Baker by Thomas v. General Motors Corp., 522 U.S. 222, 232, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998) (finding that the “animating purpose” of the Full Faith and Credit Clause was to “alter the status of the several states as independent foreign sovereignties” and “make them integral parts of a single nation”) (internal citation omitted); Katz v. United States, 389 U.S. 347, 350-51, 359, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (finding that one of the purposes of the Fourth Amendment is to protect the public’s reasonable expectations of privacy, and holding that the admission of evidence obtained by an electronic wiretap without a warrant is unconstitutional); Green v. U.S., 355 U.S. 184, 187, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957) (emphasizing that the Double Jeopardy Clause of the Fifth Amendment was “designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense”).
At the time of the founding, the purpose of the Recess Appointments Clause was to enable the President to fill vacancies that arose when the Senate is disabled from acting upon appointments. The Framers’ only known discussion of the Recess Appointments Clause is The Federalist No. 67, by Alexander Hamilton. Hamilton wrote:
The relation in which [the recess appointments] clause stands to the [advice- and-consent clause], which declares the general mode of appointing officers of the United States, denotes it to be nothing more than a supplement to the other, for the purpose of establishing an auxiliary method of appointment, in cases to which the general method was inadequate. The ordinary power of appointment is confined to the President and Senate jointly, and can therefore only be exercised during the session of the Senate; but as it would have been improper to oblige this body to be continually in session for the appointment of officers and as vacancies might happen in their recess, which it might be necessary for the public service to fill without delay, the succeeding clause is evidently •intended to authorize the President, singly, to make temporary appointments “during the recess of the Senate, by granting commissions which shall expire at the end of their next session.”
The Federalist No. 67, at 391 (Isaac Kramnick ed., 1987) (emphasis in the original).[6] Thus, Hamilton argues, the Framers added the Recess Appointments Clause to the Constitution in order to ensure that the President would be able to fill offices when the Senate was unable to act on the President’s nominees. Nowhere does Hamilton suggest that the clause was added to allow the President to appoint someone whom the Senate might refuse to confirm.
The leading early nineteenth-century constitutional treatise, Joseph Story’s Commentaries on the Constitution, reinforces this description of the purpose of the Recess Appointments Clause. Story notes that the recess appointment power was designed to avoid requiring the Senate to be “perpetually in session, in order to provide for the appointment of officers.” As such, Story wrote, the clause was meant simply to further the interests of “convenience, promptitude of action, and general security.”[7]
*1233 Without quite admitting the point in full, the majority correctly acknowledges that allowing the President to fill up vacancies in federal offices while the Senate is disabled from acting on presidential nominations is the purpose of the recess appointment power. See Order at 1224 (“We accept that, it was the intent of the Framers to keep important offices filled and government functioning.”); id. at 1226 (“[T]he main purpose of the Recess Appointments Clause [is] to enable the President to fill vacancies to assure the proper functioning of our government.”). But the majority’s reading of the scope of the recess appointment power is far broader than this justification allows. This is because the majority’s holding gives a President the power to repeatedly circumvent the Senate’s advice-and-eonsent role even when the Senate is not disabled from ezer-oising that role but is, instead, perfectly capable of exercising it.
Under the majority’s reading, if the Senate refuses to give its consent to a particular nominee during a particular session, there is nothing to stop a President from waiting not just until the immediately ensuing recess, but also until after the Senate has repeatedly reconvened and recessed before appointing that person through the recess appointment power. There is absolutely no reason why the Senate would not be able to exercise its advice-and-consent role over this long span of time, and yet the majority’s interpretation gives a President the ability to appoint someone without regard to whether the Senate has in fact been available to consider that nominee. All that a President need worry about, under such a view, is (1) whether the Senate is in town and (2) whether there is a vacancy in a federal office.
This example suffices to show that the majority’s explanation of the justification of the Recess Appointments Clause — to allow a President to fill vacancies when the Senate cannot act to confirm nominees— bears little or no relation to its reading of the scope of a President’s recess appointment power. For this reading makes no attempt to limit the use of the recess appointment power to those circumstances in which the Senate is in fact disabled from acting on presidential nominations, even though this is the only conceivable (and indeed the only historical) justification for the recess appointment power. As Hamilton emphasized in The Federalist No. 67, the recess appointment power is “nothing more than a supplement” or “auxiliary” to the “ordinary” and “general mode of appointing officers of the United States,” which is “jointly,” by way of the Senate’s advice and consent. The Federalist No. 67, at 391 (Isaac Kramnick ed., 1987) (emphasis in the original). The majority’s decision, however, entails that a President can fill a vacancy at any point in the future when the Senate is not in session. • This cannot be correct.
III. Structural Principles and the Separation of Powers
Where a provision of the Constitution is silent on a matter, we must also read that provision so that it will harmonize with other constitutional provisions. See Nevada v. Hall, 440 U.S. 410, 433, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979) (“[W]hen the Constitution is ambiguous or silent on a particular issue, this Court has often relied on notions of a constitutional plan — the implicit ordering of relationships within the federal system necessary to make the Constitution a workable governing charter and to give each provision within that document the full effect intended by the Framers.”). If the Constitution did not contain any other provisions concerning the appointment of federal officers, it might be possible to conclude with the majority that a President could fill a vacancy created *1234 during one recess with an appointment made during a subsequent recess.- It might even be possible to conclude that a President could fill a vacancy created during a recess at any future time, including when the Senate is in active session. But the Constitution does contain another provision concerning the appointment of federal officers. The Constitution states that the President
shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and .Consuls, Judges of the supreme Court, and all other Officers of the United States.
U.S. Const., art. II, § 2, cl. 2. Thus, the Constitution gives to the Senate the power to withhold its consent to any nomination to a federal office made by a President. By interpreting the Recess Appointments Clause, to allow a President to fill a vacancy' created during one recess with an appointment made during a subsequent recess, we are effectively allowing a President to side-step the Senate’s advice-and-consent' role even where the Senate is not disabled from fulfilling that role — which, I note again at the risk of repetition, was and still is the only reason for creating a recess appointment power.
I do not believe that the Constitution permits a President to' frustrate in this way the careful separation of powers intended by the framers. In between a recess during which the vacancy was created and a recess during which it is filled, the Senate would be in active session and would be perfectly capable of carrying out its advice-and-consent responsibilities. There would be no reason why the Senate would not in fact carry out those responsibilities — unless, of course, it chose not -to give its consent to a particular candidate. Yet the Senate’s refusal to consent to a presidential nomination does not justify the President in circumventing the text and structure of the Constitution.
Considering that the Recess Appointments Clause was intended to enable the President to fill vacancies only when the Senate was disabled from acting, and in light of the role that Article II gives the Senate in approving nominations to federal offices, there must be some more meaningful limit on the President’s power to make a recess appointment than the two the majority proposes (i.e., that the Senate be in recess and' that' theré be a vacancy to fill). The only plausible limit — as well as the most obvious one — is to require the President to fill a vacancy during the same recess in the course of which it happens. This reading is supported not only by considerations of constitutional purpose and structure, but also by the language of the Recess Appointments Clause, which suggests that the context in which the recess appointment power is triggered — the happening of a vacancy during a particular recess — also defines the limits of the recess appointment power. See The Federalist No. 67, at 391 (Alexander Hamilton) (Isaac Kramnick ed., 1987) (“The time within which the [recess appointment] power is to operate, ‘during the recess of the Senate,’ and the duration of the appointments, ‘to the end of the next session’ of that body, conspire to elucidate the sense of the provision ... ”).
IV. Some Additional Considerations
The Second and Ninth Circuits have ruled that the President may use the recess appointment power to fill any vacancy that exists at the time of a particular recess, even if the vacancy did not happen or occur during that same recess. See United States v. Allocco, 305 F.2d 704 (2nd Cir.1962); United States v. Woodley, 751 F.2d 1008 (9th Cir.1985). In so finding, Woodley relied essentially upon the reasoning of Allocco, which conceded that its *1235 interpretation of the recess appointment power did not reflect a literal and logical reading of the Constitution. The Allocco Court observed that, in matters of constitutional interpretation, “the logic of words should yield to the logic of realities.” Allocco, 305 F.2d at 710 (quoting Di Santo v. Pennsylvania, 273 U.S. 34, 43, 47 S.Ct. 267, 71 L.Ed. 524 (1927) (Brandéis, J., dissenting)). By “the logic of realities,” the Allocco Court had in mind the need to avoid a situation in which “judicial offices which .are vacant on the day the Senate adjourns must remain vacant until the Senate reconvenes and has the opportunity to fill them.” Id. Any other result, the Allocco Court reasoned, would “create Executive paralysis and do violence to the orderly functioning of our complex government.” Id. at 712.
As an initial matter, while it is a proper for an Article III court to consider the range of circumstances that its interpretation of a particular constitutional provision might cover, such consideration cannot displace the obligation to decide concrete “Cases” and “Controversies” in accordance with the plain meaning and purpose of the Constitution. See U.S. Const, art. Ill, § 2, cl. 1. Second, even on a purely practical note, the Allocco and Woodley argument about the dangers of governmental paralysis is more of a phantom than anything else, even in the context of our own times. The vacation of an office vital to the conduct of national security two days before the Senate goes on recess is a useful example. Despite the initial appeal of the Allocco and Woodley argument in this context, a few moments of reasoned deliberation will show that adhering to the plain meaning and purpose of the Recess Appointments Clause does not threaten in any way the President’s ability to successfully manage the government during a security crisis. Common sense and practical experience tell us that the President can and does call upon whichever individuals— acting officials, deputy directors, etc. — he needs to assist him in such a situation. A formal appointment is of little importance at such a time.
In contrast, there is a real, concrete concern that the understanding of the recess appointment power embraced by the majority will allow the President to repeatedly bypass the role the Framers intended the Senate to play in reviewing presidential nominees. Thus, for the reasons discussed above, the reasoning of Al-locco and Woodley not only fails to adhere to the text of the Constitution, as Allocco itself acknowledged, but also makes the wrong tradeoff between executive and legislative authority, a tradeoff that comports neither with the purpose of the Recess Appointments Clause nor with the structure of the Constitution.[8]
Other than Allocco and Woodley, neither of which establishes the governing law of this circuit, the only authority the majority is able to muster for its interpretation is 5 U.S.C. § 5503 (1994). The majority characterizes this statute as a discussion of “salary requirements for officers appointed to fill a vacancy that existed while Senate was in session” and suggests that it indicates Congress has implicitly agreed with the majority’s interpretation. Order at 1227. But 5 U.S.C. § 5503 is not a discussion of “salary requirements” at all. Rather, it provides that
[pjayment for services may not be made from the Treasury of the United States *1236 to an individual appointed during a recess of the Senate to fill a vacancy in an existing office, if the vacancy existed while the Senate was in session and was by law required to be filled by and with the advice and- consent, of the Senate, until the appointee has been confirmed by the Senate.
5 U.S.C. § 5503(a). Contrary to what the majority suggests, this statute does not indicate that Congress has impliedly consented to the majority’s interpretation of the Recess Appointments Clause. Rather, the statute shows just the opposite: it shows that Congress itself has disapproved of the President’s use of the recess appointment power to fill a vacancy that “existed while the Senate was in - session and was by law required to be filled by and with the advice and consent of the Senate.” Id.[9]
The statute goes on to set forth three very limited exceptions to the general prohibition on the payment of salaries to officers appointed in violation of the Recess Appointments Clause.[10] But those exceptions do not establish the constitutionality of the majority’s interpretation: they suggest instead that Congress has simply decided to recognize the reality of an existing (and unconstitutional) practice. The exceptions to the statute only underline that Congress does not have the last word over the constitutionality of the President’s use of the recess appointment power. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) (“It is emphatically the province and duty of the judicial department to say what the law is.”). Moreover, I do not see how these exceptions, which were' added to the statute in 1940,[11] can be used to tell us anything about the meaning of a constitution framed and ratified in. the late 1780s. If anything, 5 U.S.C. § 5503 undermines rather than supports the majority’s decision.
The statute also calls into question the Woodley Court’s finding, echoed by the majority here, that “there is-an unbroken acceptance of the President’s use of the recess power ... by the three branches of government.” Woodley, 751 F.2d at 1011. Nor is 5 U.S.C. § 5503 the only evidence of congressional disagreement with the President’s understanding of the scope of the recess appointment power. See, e.g., William Rawle, A View of the Constitution of the United States 162-67 (2nd ed. 1829) at 162-67 (quoted in Ralph Lerner and Philip Kurland, eds., The Founders’ Constitution (1987), yol. 4 at 115) (“It would be improper to pass over the construction *1237 given by the senate to the power of appointing during their recess. It has been held by that venerable body, that if new offices are created by congress, the president cannot, after the adjournment of the senate, make appointments to fill them. The vacancies do not happen during the recess of the senate.”) (emphasis in the original).
More to the point, however, even if one accepts at face value the Woodley Court’s assertion of an “unbroken” history of acceptance, the failure of one branch of government to challenge how another branch understands or applies the Constitution does not render the latter’s view correct. This is particularly so where the Constitution’s plain meaning, purpose, and structure all militate against accepting that view. Nor does the failure of litigants to bring constitutional challenges to the executive’s use of the Recess Appointment Clause tell us anything about what the clause means. Adverse possession is a rule of property law, not constitutional law. There is no statute of limitations for interpreting and enforcing the Constitution. See Freytag v. C.I.R., 501 U.S. 868, 880, 111 S.Ct. 2681, 2689, 115 L.Ed.2d 764 (1991) (finding that “[njeither Congress nor the Executive can agree to waive [the] structural protection” of the Appointments Clause, and that the “structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic”); I.N.S. v. Chadha, 462 U.S. 919, 942 at n. 13, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (rejecting the argument that a law dating back to 1940 is immune to the constitutional scrutiny of courts simply because it was passed by Congress and approved by the President). The President’s use of the recess appointment power has been challenged on appeal only twice before, in Allocco and Woodley, both of which decisions privileged a supposed history of congressional and judicial acquiescence over the Constitution’s plain meaning, purpose, and structure. The question of which should prevail — a debatable historical view or the clear import of the Constitution — has never before reached the Supreme Court.
A final observation: by invoking the political question doctrine at the end of its order, the majority conflates the Plaintiff-Appellees’ description of the circumstances of Judge Pryor’s appointment with the reasons for its unconstitutionality. See Majority Order at 1226-27 (“Plaintiff-Ap-pellees ... contend that the President misused [his] discretionary appointment authority in this particular instance because Judge Pryor’s nomination — before the recess appointment — had been especially controversial and his confirmation had been blocked in the Senate. The argument, as we understand it, is that this specific recess appointment circumvented, and showed an improper lack of deference to the Senate’s adviee-and-consent role and, thus, should not be allowed.”). I agree that whether the President shows an improper lack of deference to the Senate in any given circumstance might indeed be a political question. But that is not the question we face. We are asked to decide whether the President exceeded his authority by appointing Judge Pryor.[12] For the reasons outlined above, the Constitution provides a clear answer to this question. Therefore we cannot shirk our duty to resolve this matter simply because it may have some political consequences. That a decision may have political consequences certainly does not make it non- *1238 justiciable under the political question doctrine. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962) (“The doctrine of which we treat is one of ‘political questions,’ not one of ‘political cases.' The courts cannot reject as ‘no law suit’ a bona fide controversy as to whether some action denominated ‘political’ exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.”). See also Chadha, 462 U.S. at 943, 103 S.Ct. 2764 (“Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications”).
I respectfully dissent.

. It is difficult for any of us to sit in judgment on the constitutionality of a colleague’s appointment. I would have preferred to certify this question directly to the Supreme Court per 28 U.S.C. § 1254(2), or to request that the Supreme Court appoint another court to hear the matter. Since the court has chosen to answer the question instead, I too address it.

. The majority unnecessarily renders a decision as to the third question, finding that "the Recess” is ambiguous enough to encompass both inter-session and intra-session recesses. Although I would not reach this question, the text of the Constitution as well as the weight *1229 of the historical record strongly suggest that the Founders meant to denote only inter-session recesses. The textual point does not require much explanation. Had the Framers intended to include intra-session as well as inter-session recesses, they could very easily have used the phrase "during a recess of the Senate.” They chose instead to adopt a singular construction: "the Recess of the Senate” (emphasis added). In addition, they capitalized the term "Recess,” which suggests particularity rather than generality, formal rather than generic meaning.
These textual considerations are reinforced by the fact that early American legislators were forced to interrupt the work that provided their primary source of income and to travel slowly over long distances to a legislative seat. The Framers' use of the singular construction "the Recess” must be situated within this historical context.
The earliest congressional and presidential papers bear out this interpretation of the phrase "the Recess.” See, for example, Journal of the Executive Proceedings of the Senate of the United States of America, 1789-1805 (February 9, 1790), at http://memory.loc.gov /ammem/amlaw/lawhome.html (last visited September 28, 2004) (Senate postponing consideration, early in the second session of the first Congress, of President Washington’s message "relative to 'certain persons who decline the acceptance of offices, and to certain temporary appointments during the recess’ ”); President George Washington’s Fifth Annual Message to Congress (December 3, 1793), at http://www.yale.edu/lawweb/avalon/presi-den/sou/washs05.htm (last visited September 29, 2004) (noting, on the day after the third Congress convened to begin its first session, that the Creek Indians "have been relieved with corn and with clothing, and offensive measures against them prohibited during the recess of Congress”); and Journal of the Senate of the United States of America, 1789-1873 (May 23, 1794), at http:// memory.loc.gov/am-mem/amlaw/lawhome.html (last visited September 28, 2004) (Senate adoption of several amendments to a bill authorizing the President, "during the recess of the present Congress, to cause to be purchased or built a number of vessels, to be equipped as galleys in the service of the United States”).

. On both occasions in which the text of the Recess Appointments Clause is quoted in The Federalist Papers, the phrase "during the re *1230 cess of the Senate " is emphasized. See The Federalist No. 67, at 390 (Alexander Hamilton) (Isaac Kramnick ed., 1987) ("The President shall have power to fill up all vacancies that may happen during the recess of the Senate, by granting commissions which shall expire at the end of their next session.”); and The Federalist No. 76, at 428 (Alexander Hamilton) (Isaac Kramnick ed., 1987) ("The President shall have power to fill up all vacancies which may happen during the recess of the Senate, by granting commissions which shall expire at the end of their next session.”). The majority’s interpretation of the clause would attribute little if any meaning to the emphasis that Alexander Hamilton places on the term "during” in these two papers. If anything, Hamilton's emphasis on the phrase “during the recess of the Senate " is inconsistent with the majority's interpretation, which would give the President the power to fill vacancies that occur even when the Senate is in session. By contrast, a reading of the clause that limits the President's power to only those vacancies that occur while the Senate is in recess seems much more faithful to Hamilton's emphasis on the word "during" here.

. The OED entry goes on to describe "happen” as the "most general verb to express the simple occurrence of an event.” All of the eighteenth-century English dictionaries that I have consulted, including all those printed in America, support this reading of the term "happen.” Thus, Samuel Johnson’s Dictionary of the English Language (published in London in 1755) defines "happen” as "to fall out; to chance; to come to pass.” William Perry's Royal Standard English Dictionary (published in London in 1775, in America in 1788) defines "happen” as "to come to pass, to light on.” Thomas Sheridan's Complete Dictionary of the English Language (published in London in 1780, where it first appeared as General Dictionary of the English Language, in America in 1789) defines "happen” as "to fall out by chance; to light on by accident.” John Entick's New Spelling Dictionary of the English Language (published in London in 1764, in America in 1800) defines “happen” as "to fall out, come to pass, chance.” John Walker's Critical Pronouncing Dictionary and Expositor of the English Language (published in London in 1791, in America in 1803) defines "happen” as "to fall out by chance, to come to pass; to light on by accident.” Samuel Johnson, Jr. and John Elliott's Selected Pronouncing and Accented Dictionary (published in America in 1800) defines "happen” as "to fall out, come to pass.” Caleb Alexander’s Columbian Dictionary of the English Language (published in America in 1800) defines "happen” as "to fall out, to light on.” Finally, Noah Webster’s Compendious Dictionary of the English Language (published in America in 1806), also known as "Webster’s First Dictionary,” defines "happen” as “to fall out, come to pass, chance.”
To the extent that these definitions differ from today's usage, it is not insofar as they suggest that "exist” was a recognized synonym for "happen,” for that comparison is nowhere made in any of the above dictionaries. Rather, the difference is that the eighteenth-century definitions suggest a somewhat more pronounced emphasis on the element of chance or fortuity, an emphasis entirely consistent with the plain meaning of the Recess Appointments Clause.
The majority’s response to all of this evidence is simply to note that "happen” in today's usage can also mean "befall,” which can also mean "happen to be.” See Majority Order at 1225-26. This is at best a strained effort to avoid the available dictionary evidence, and with it the plain meaning rule. A cross-reference is not a direct definition, and this reference comes from a contemporary and not an eighteenth-century dictionary. The majority provides no direct evidence from either contemporaty or eighteenth-century dictionaries — and no evidence at all from any eighteenth-century dictionaries — that "happen” can mean "exist.”

. See also William Rawle, A View of the Constitution of the United States 162-67 (2nd ed. 1829) (quoted in Ralph Lerner and Philip Kerner, eds., The Founders’ Constitution (1987), vol. 4 at 115) ("It would be improper to pass over the construction given by the senate to the power of appointing during their recess. It has been held by that venerable body, that if new offices are created by congress, the president cannot, after the adjournment of the senate, make appointments to fill them. The vacancies do not happen during the recess of the senate.”) (emphasis in the original); and S.Rep. No. 37-80, at 3-6 (3d. Sess.1863) (rejecting the argument that the term "happen” in the Recess Appointments Clause can be construed to mean "happen to exist”).

. Hamilton's purpose in this paper was to rebut the allegation that the Constitution would have allowed the President, rather than the governors of the states, to fill vacancies in the Senate.

. 3 Joseph Stoiy, Commentaries on the Constitution § 1551 (1833) (quoted in Ralph Lerner and Philip Kerner, eds., The Founders’ Constitution (1987), vol. 4 at 122).

. It is also worth noting that Woodley makes selective and somewhat misleading use of the various eighteenth-century dictionary definitions of “happen” quoted in footnote 1 above. See Woodley, 751 F.2d at 1013 n. 8. The effect is to minimize the extent to which those definitions suggest that “happen” meant "to occur” or "take place” even in the eighteenth century, and not merely in "modem” usage.

. See S.Rep. No. 37-80 at 3-6 (3d. Sess.1863) (explaining the rationale for the law now known as 5 U.S.C. § 5503 and rejecting the argument that the term "happen” in the Recess Appointments Clause can be construed to mean "happen to exist”).

. The statute does not apply:
(1) if the vacancy arose within 30 days before the end of the session of the Senate;
(2) if, at the end of the session, a nomination for the office, other than the nomination of an individual appointed during the preceding recess of the Senate, was pending before the Senate for its advice and consent; or
(3) if a nomination for the office was rejected by the Senate within 30 days before the end of the session and an individual other than the one'whose nomination was reject- ■ ed thereafter receives a recess appointment.
5 U.S.C. § 5503(a)(l-3). It also provides that any nomination to fill a vacancy described in one of those three exceptions "shall be submitted to the Senate not later than 40 days after the beginning of the next session of the Senate.” 5 U.S.C: § .5503(b). As the majority also fails to acknowledge, none of the three exceptions applies to the instant case.

. Compare Rev. Stat. § 1761 as amended by 43 Stat. 669 (Act of June 7, 1924) with 54 . Stat. 751 (1940). By contrast, the prohibition , on payment of salaries to individuals appointed to fill vacancies that existed while the Senate was in session dates back to 1863. See 12 Stat. 646 (Act of February 9, 1863).

. I note that the majority first claims that the motion somehow raises a separable "political question.” However, when it comes to explaining why the court chose not to certify the question to the Supreme Court, the majority argues that "the motion raises purely legal, constitutional issues.” Majority Order at 1228 n.14.